# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 05-3295

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff/Appellant, | * | |
| | * | |
| v. | * | |
| | * | Appeal from the United States |
| $124,700, in U.S. Currency, | * | District Court for the |
| | * | District of Nebraska. |
| Defendant/Appellee, | * | |
| | * | |
| Manuel Gomez; Andres Madrigal | * | |
| Morgan; Emiliano Gomez Gonzolez, | * | |
| | * | |
| Claimants/Appellees. | * | |

———————

Submitted: April 19, 2006
Filed: August 18, 2006

———————

Before ARNOLD, LAY, and COLLOTON, Circuit Judges.

———————

COLLOTON, Circuit Judge.

The United States initiated civil forfeiture proceedings against $124,700 in United States currency, alleging that the money was subject to forfeiture as the proceeds of a drug transaction or as property used to facilitate the possession, transportation, sale, concealment, receipt, or distribution of a controlled substance. *See* 21 U.S.C. § 881(a)(6). Three individuals filed claims opposing the forfeiture, and

after a bench trial, the district court entered judgment in favor of the claimants. The government appeals, and we reverse and remand for further proceedings.

I.

The defendant currency was seized on May 28, 2003, from one of the claimants, Emiliano Gomez Gonzolez. According to testimony adduced at trial, Gonzolez was driving west on Interstate 80 in a rented Ford Taurus when a Nebraska State Patrol Trooper, Chris Bigsby, stopped Gonzolez for exceeding the posted speed limit. Trooper Bigsby testified that he asked Gonzolez to sit in the front passenger side of his patrol vehicle during the stop. At Bigsby's request, Gonzolez presented a Nevada driver's license and a rental contract for the car, but the rental contract was not in Gonzolez's name and did not list Gonzolez as an additional driver.

Trooper Bigsby did not speak fluent Spanish, but he testified that Gonzolez responded to his questions, which were mostly in English, in a combination of English and Spanish. Bigsby asked Gonzolez where he was going, and Gonzolez responded that he had been in Chicago for three days. Gonzolez indicated that a person named "Luis" had rented the car for him, but the name "Luis" did not match the name on the rental agreement that he presented to Trooper Bigsby. Trooper Bigsby also twice inquired whether Gonzolez had ever been arrested or placed on probation or parole, and Gonzolez said that he had not.

Before Trooper Bigsby had completed the traffic stop, another officer, Jason Brownell, stopped to ask if Bigsby needed any assistance. When Trooper Bigsby found out that Trooper Brownell had some Spanish-speaking ability, Bigsby asked if Brownell would stay and assist. Trooper Bigsby testified that with Brownell's assistance, he completed a warning citation and returned Gonzolez's license and paperwork. Having learned through his dispatcher that Gonzolez had been arrested in 2003 for driving while intoxicated, Bigsby then asked, through Trooper Brownell,

if he could "ask a few more questions," and Gonzolez answered yes. Again through Trooper Brownell, Bigsby asked if Gonzolez had ever been arrested for driving while intoxicated, and Gonzolez answered that he had. Bigsby and Brownell also inquired whether any alcohol, guns, marijuana, methamphetamine, heroin, or large amounts of cash were in the car, and Gonzolez answered no. Brownell then asked for, and received, consent to search the car. Trooper Bigsby went directly to the rear passenger side of the vehicle and opened a cooler that was in the back seat, where he found a large plastic bag that contained seven bundles wrapped in rubber bands inside aluminum foil packaging. These bundles contained a total of $124,700 in currency. Gonzolez and the vehicle were then taken to the Nebraska State Patrol office in Lincoln.

In Lincoln, Trooper Bigsby continued his investigation with the help of another trooper, Sean Caradori, and Trooper Caradori's police canine, Rico. Rico was deployed to sniff the exterior of the car, and the dog alerted to the rear passenger side of the vehicle. Trooper Caradori testified that he conducted a test of the money that was found within the vehicle by hiding both the currency taken from Gonzolez's car and a separate stack of seven bills borrowed from other troopers in the troopers' break room. Caradori testified that Rico alerted to the defendant currency but not to the money borrowed from the troopers.

At trial, the government argued that the dog's alert, along with the large amount of cash that was seized, the circumstances of Gonzolez's travel, and Gonzolez's initial false denials that he was carrying cash or that he had a criminal history, showed that the currency was substantially connected to a drug transaction. The claimants, however, argued that the cash was acquired legitimately. Manuel Gomez testified that he had given Gonzolez $65,000 in cash, which was a combination of money that he had borrowed from his father-in-law and his own personal cash savings, with the expectation that Gonzolez would help him buy a refrigerated truck for the produce business. Gonzolez testified that he gave $40,000

of his own money, plus $20,000 from a friend, Andres Madrigal Morgan, as an investment in Gomez's truck. Consistent with Gonzolez's account, Andres Madrigal Morgan testified that he contributed $20,000 in proceeds from a vehicle sale to Gonzolez's investment in the truck.

Gonzolez testified that after he had pooled the cash from Madrigal Morgan and Gomez with his own cash, he heard from a friend in Chicago that a truck might be available there from a friend of the friend, and he set out for Chicago by plane, taking the cash with him in a small carry-on bag. Gonzolez said, however, that when he arrived in Chicago and his friend picked him up from the airport, he learned that the truck had been sold. In addition, the unidentified friend alerted Gonzolez that it was "bad" to carry more than $10,000 in cash on your person. Newly fearful of carrying his cash back to California by plane, Gonzolez testified that he decided to rent a car rather than fly, but because neither he nor his friend had a credit card, a third individual rented the car for him.

Gonzolez also testified that he hid the money in a cooler because he was afraid that he might be assaulted or have the money stolen if it was readily observable. He also explained that he was "scared" when the troopers began questioning him about whether he was carrying drugs or currency. He said that he lied about the money and about the names of other parties involved, because he believed that carrying large amounts of cash might be illegal, and he did not want to get his friends in trouble. With respect to Trooper Bigsby's question about whether he had ever been arrested, Gonzolez testified that Bigsby asked whether he "had any crimes" or "had been a prisoner." Gonzolez said he answered "no," despite his arrest for driving under the influence, because he "didn't think that that was a crime." (Tr. at 400).

The district court concluded that the government had not established, by a preponderance of the evidence, that there was a substantial connection between the money and a drug trafficking offense. The court noted that large sums of unexplained

currency can be evidence of drug trafficking, and that in this case the money was bundled in an unusual manner. The court also concluded, however, that the claimants had given a "plausible and consistent explanation for [the money's] origin and intended use," (Add. at 12), and that "the bundling is consistent with an attempt to sort the currency by contributor and conceal the currency from would-be thieves," and not just to evade law enforcement. (*Id*. at 13). In addition, the court observed that the government had not presented any expert testimony about "whether the manner the bundles were wrapped either increased or decreased the likelihood of the currency's use or connection with a drug trafficking offense." (*Id*.).

With respect to the canine alert, the court agreed that the alert provided some, but only slight, evidence that the money was connected to drug trafficking. The court also considered the circumstances and route of Gonzolez's travel, and the fact that Gonzolez had lied about the names of his friends and other details, but did not believe that this evidence taken together with the other circumstances, including all the claimants' lack of significant criminal history, established a substantial connection to drug activity. Because the court determined that the money was not subject to forfeiture, it did not reach the question whether the claimants were innocent owners.

II.

Since the enactment of the Civil Asset Forfeiture Reform Act of 2000, the burden is on the government to establish, by a preponderance of the evidence, that seized property is subject to forfeiture. 18 U.S.C. § 983(c)(1). Forfeiture is warranted under 21 U.S.C. § 881 when the government establishes a "'substantial connection' between the property" and a controlled substance offense. 18 U.S.C. § 983(c)(3). We review any predicate factual findings for clear error, but the ultimate conclusion as to whether those facts establish a "substantial connection" between seized currency and a narcotics transaction is a mixed question of law and fact that we review *de novo*. *See United States v. Dodge Caravan Grand SE/Sport Van*, 387

F.3d 758, 761 (8th Cir. 2004); *United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 501 (8th Cir. 2004); *see also United States v. $117,920.00 in U.S. Currency*, 413 F.3d 826, 829 (8th Cir. 2005).

The district court's opinion includes no finding as to the credibility of Gonzolez and the other two claimants. The court did observe that the explanations of the claimants were "plausible and consistent," but this is different from a finding that the court actually *believed* the testimony. "Plausible" means "apparently acceptable or trustworthy (sometimes with the implication of mere appearance)," *see Shorter Oxford English Dictionary* 2238 (5th ed. 2002), and we thus read the district court's opinion to hold that given a "plausible and consistent" explanation from the claimants on one side of the balance, the government's countervailing proof was not strong enough to meet its burden of showing a substantial connection by a preponderance of the evidence.

On *de novo* review, we respectfully disagree and reach a different conclusion. We believe that the evidence as a whole demonstrates by a preponderance of the evidence that there was a substantial connection between the currency and a drug trafficking offense. Possession of a large sum of cash is "strong evidence" of a connection to drug activity, *$84,615 in U.S. Currency*, 379 F.3d at 501-02, and Gonzolez was carrying the very large sum of $124,700. The currency was concealed in aluminum foil inside a cooler, and while an innocent traveler might theoretically carry more than $100,000 in cash across country and seek to conceal funds from would-be thieves on the highway, we have adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking.

*$117,920.00 in U.S. Currency*, 413 F.3d at 829. The canine alert also supports the connection. *Id.*[1]

The route and circumstances of Gonzolez's travel were highly suspicious. Gonzolez had flown on a one-way ticket, which we have previously acknowledged is evidence in favor of forfeiture, *see United States v. U.S. Currency in the Amount of $150,660.00*, 980 F.2d 1200, 1206 (8th Cir. 1992), and he gave a vague explanation, attributed to advice from an unidentified third person, about why he elected to return by car. Gonzolez purportedly carried $125,000 in cash with him on his flight, for the purpose of buying a truck that he had never seen, from a third party whom he had never met, with the help of a friend whose name he could not recall at trial. This testimony does not inspire confidence in the innocence of the conduct. When he was stopped by the Nebraska State Patrol, Gonzolez was driving a rental car that was leased in the name of another person who was not present, another circumstance that gives rise to suspicion. Then, when Gonzolez was questioned by officers, he lied about having money in the car and about the names of his friends, thus giving further reason to question the legitimacy of the currency's presence. *See $117,920.00 in U.S. Currency*, 413 F.3d at 829. The totality of these circumstances – the large amount of concealed currency, the strange travel pattern, the inability to identify a key party in the purported innocent transaction, the unusual rental car papers, the canine alert, and the false statements to law enforcement officers – leads

---

[1]The government argues that the district court erred by according only "slight" probative value to the canine alert. That precise language, however, was drawn from one of our decisions, *see $84,615 in U.S. Currency*, 379 F.3d at 502, and the government in this case presented no expert testimony or other scientific evidence that might warrant a stronger inference. *Cf. United States v. Funds in the Amount of $30,670*, 403 F.3d 448, 457-59 (7th Cir. 2005). The significance of canine alerts is largely a scientific question, and absent a developed record, we decline to expand on our previous pronouncements in this area.

most naturally to the inference that Gonzolez was involved in illegal drug activity, and that the currency was substantially connected to it.

While the claimants' explanation for these circumstances may be "plausible," we think it is unlikely. We therefore conclude that the government proved by a preponderance of the evidence that the defendant currency was substantially connected to a narcotics offense. Accordingly, we reverse the judgment of the district court and remand for further proceedings.

LAY, Circuit Judge, dissenting.

I respectfully dissent. Although the circumstantial evidence offered by the government provides some indication that the money seized in this case may be related to criminal activity, I cannot agree that the government has proven, by a preponderance of the evidence, the requisite *substantial* connection between the currency and a *controlled substance offense*.

Notwithstanding the fact that claimants seemingly suspicious activities were reasoned away with plausible, and thus presumptively trustworthy, explanations which the government failed to contradict or rebut, I note that no drugs, drug paraphernalia, or drug records were recovered in connection with the seized money. There is no evidence claimants were ever convicted of any drug-related crime, nor is there any indication the manner in which the currency was bundled was indicative of drug use or distribution. At most, the evidence presented suggests the money seized may have been involved in some illegal activity – activity that is incapable of being ascertained on the record before us. See United States v. U.S. Currency, $30,060.00, 39 F.3d 1039, 1044 (9th Cir. 1994) ("[A] mere suspicion of illegal activity is not enough to establish . . . that the money was connected to drugs.").

The law of our circuit makes clear that the possession of a large amount of cash provides strong evidence of a connection between the *res* and illegal drug activity. Yet this fact is not dispositive. A faithful reading of the cases cited by the majority from our court reveal that we have required some additional nexus between the property seized and drug activity to support forfeiture. In United States v. U.S. Currency, in the Amount of $150,660.00, 980 F.2d 1200 (8th Cir. 1992), we recognized such a nexus where the investigating officer immediately smelled marijuana upon inspecting the currency.[2] Id. at 1203, 1206. In United States v. $84,615 in U.S. Currency, 379 F.3d 496 (8th Cir. 2004), we concluded forfeiture was proper where the owner of the seized currency "undisputedly possessed illegal drugs at the time" the currency was discovered. Id. at 502. Most recently, in United States v. $117,920.00 in United States Currency, 413 F.3d 826 (8th Cir. 2005), we determined that forfeiture was warranted where materials known to be used to package and conceal drugs were recovered in close physical proximity to the seized currency, and where the investigating officer detected the smell of marijuana on some of these materials. Id. at 829.

Here, the only evidence linking the seized money to illegal drug activity is a canine sniff that alerted officers to the presence of narcotics on the currency itself and the exterior of the rear passenger side of the rental car where the currency was discovered. However, as Justice Souter recently recognized, a large percentage of currency presently in circulation contains trace amounts of narcotics. See Illinois v. Caballes, 543 U.S. 405, 410-12 (2005) (Souter, J. dissenting). As a result, this fact is virtually "meaningless and likely quite prejudicial." United States v. Carr, 25 F.3d 1194, 1216 (3d Cir. 1994) (Becker, J., concurring). Our decision in $84,615 in U.S.

---

[2]Unlike our decision in U.S. Currency, in the Amount of $150,660.00, the odor of narcotics on the currency seized in this case was not apparent upon inspection, and thus there was no immediate relationship between drugs and the currency which would suggest the currency had recently been involved in a controlled substance offense.

<u>Currency</u> to afford this evidence only "slight" weight is thus well-founded, and this factor, taken in conjunction with the large amount of currency seized, does not favor forfeiture.  Finally, the mere fact that the canine alerted officers to the presence of drug residue in a *rental car*, no doubt driven by dozens, perhaps scores, of patrons during the course of a given year, coupled with the fact that the alert came from the same location where the currency was discovered, does little to connect the money to a controlled substance offense.  Therefore, I respectfully dissent.

_____