**UNITED STATES of America,
Plaintiff,**

v.

**$433,980 IN UNITED STATES
CURRENCY, Defendant
in rem.**

**No. 5:05 CV 5 BO(1).**

United States District Court,
E.D. North Carolina.
Western Division.

Jan. 17, 2007.

See also 473 F.Supp.2d 672, 2006 WL 4043773.

Stephen A. West, United States Attorney, Raleigh, NC, for United States of America, Plaintiff.

M. Gordon Widenhouse, Jr., Rudolf Widenhouse & Fialko, Chapel Hill, NC, for $433,980.00 in U.S. Currency, Defendant.

## ORDER

TERRENCE WILLIAM BOYLE, District Judge.

This matter is before the Court on Plaintiff United States' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Motion will be GRANTED.

## FACTS

On the morning of July 14, 2004, while patrolling Interstate 95 in Johnston County, North Carolina, State Trooper A.R. DiGiovanni ("DiGiovanni") observed Claimant Andres Rodriguez's ("Rodriguez") Lincoln Towncar change lanes abruptly and begin driving close behind another vehicle. DiGiovanni thought Rodriguez to be following too closely, a traffic offense under state law, and at 7:54 AM made a lawful stop of Rodriguez's car. DiGiovanni asked Rodriguez to exit his vehicle and then to stand near the front of DiGiovanni's patrol car. Rodriguez's sole passenger, Victor Escobar ("Escobar") remained seated in the front passenger seat of Rodriguez's car.

Upon separating the two men, DiGiovanni then asked to see Rodriguez's license and proof of registration, and accompanied Rodriguez back to his vehicle to retrieve them. While Rodriguez re-entered the car to find those documents, DiGiovanni observed three cell phones near the front center console, along with a roll of clear packaging tape and a map of Miami, Florida, on the back seat. Searching for his registration, Rodriguez also opened the glove compartment, in which DiGiovanni could see a new screw driver set and a pair of pliers. The original packaging material for these tools sat next to them in the glove compartment.

Rodriguez produced a New York State driver's license but no registration. He did, however, present DiGiovanni with valid proof of insurance. As he handed his license to DiGiovanni for inspection, DiGiovanni noticed that Rodriguez's hands were trembling, and that he seemed unusually nervous. DiGiovanni then asked Rodriguez whether he was a citizen, permanent or temporary resident of the United States, what he did for work, and where he was heading on I-95. Rodriguez responded that he had been a resident of the United States for five years, that he was a self-employed cab driver, and that he was traveling to visit friends in Jacksonville, Florida.

DiGiovanni asked Rodriguez to remain standing in the same area near the front of his patrol car, and then walked to the passenger side of Rodriguez's vehicle to speak to Escobar. DiGiovanni asked Escobar similar questions about his residence, employment, and the nature of his journey with Rodriguez. Escobar first

told DiGiovanni that he had lived in Queens for three years, and that he did not have a work visa. He then told DiGiovanni he was on vacation in the United States, and periodically returned to his home country of Colombia. Escobar also said he worked with a friend doing construction projects on Long Island. Escobar's passport, which he presented to DiGiovanni, identified him as a citizen of Cali, Colombia and indicated that Escobar had arrived in the United States several years previously. Escobar also said he and Rodriguez were traveling for a vacation, but said that their destination was Miami, Like Rodriguez, Escobar was visibly nervous, and his breathing was rapid and shallow.

At 8:01, DiGiovanni returned to the area in front of the patrol car where Rodriguez was standing and asked Rodriguez to sit inside the patrol car's front seat. DiGiovanni then radioed Highway Trooper C.L. Jones ("Jones"), who was approximately 200 yards behind the group on I-95, and requested his assistance. At 8:02, DiGiovanni began writing out a courtesy warning for following too closely; he then re-parked the patrol car so as to locate it closer to the highway's shoulder.[1] DiGiovanni asked Rodriguez if he had ever been arrested, and Rodriguez said he had not. At 8:07, DiGiovanni issued a courtesy warning to Rodriguez for following too closely, and told Rodriguez that he was free to leave.

However, before Rodriguez had exited his patrol car, DiGiovanni asked Rodriguez's permission to question him further about the trip to Florida, and Rodriguez agreed. DiGiovanni then told Rodriguez

he was suspicious, and pointed out the inconsistency in the two men's stories—specifically that Rodriguez had identified Jacksonville as their ultimate destination, while Escobar had said it was Miami. DiGiovanni inquired whether the car contained weapons, drugs, United States currency, or specially designed storage compartments. Rodriguez answered each question in the negative, and specifically denied carrying over $10,000 in the car. At this point DiGiovanni sought and obtained from Rodriguez both written and oral consent to search his vehicle. At no time did Rodriguez refuse to answer any questions, ask to leave, or withdraw consent to search his car.

DiGiovanni asked Rodriguez to remain in the patrol car while he performed the search; he then returned to Rodriguez's vehicle, and asked Escobar to join Rodriguez in the patrol car. DiGiovanni then patted Escobar down, and Escobar sat down alongside Rodriguez. Jones, who arrived on the scene with a drug sniffing dog a few minutes after DiGiovanni's radio call, then began an exterior canine sniff of Rodriguez's vehicle. The dog made one revolution around the car without alerting to the presence of narcotics. On its second trip around Rodriguez's vehicle, the dog alerted next to the passenger side rear quarter panel.[2]

After searching the passenger compartment, DiGiovanni then opened the trunk and saw a large Frosted Flakes cereal box which had been sealed with black electrical tape. He removed the tape and observed a large amount of United States

---

**1.** DiGiovanni's patrol car was equipped with a video camera, which recorded his encounter with Rodriguez. A videotape copy of the recording has been provided to the Court. However, neither the tape nor its transcript allows for an exact determination of how long it took DiGiovanni to write out the courtesy warning.

**2.** The significance of the dog's first alert is not clear from the record before the Court. Jones observed, and the United States concedes, that the dog's alert next to Rodriguez's vehicle may have involved, a least in part, the dog's detection of another dog's urine somewhere on or underneath the suspect's car.

currency. DiGiovanni then returned to Escobar and Rodriguez, handcuffed them both, and re-seated the pair in the patrol car. DiGiovanni told the two men that they were not under arrest, but were merely being "lawfully detained." DiGiovanni then completed the search, which would ultimately reveal two additional boxes containing manilla envelopes stuffed with currency. Rodriguez and Escobar had transported a total of $433,980. When asked, Escobar denied all knowledge of the currency. Despite his earlier denial, Rodriguez then acknowledged that the money belonged to him.

In all, the exchange between the suspects and the two state troopers, beginning with DiGiovanni's traffic stop and concluding with the removal of the $433,980, occupied approximately forty minutes. DiGiovanni seized the currency and drove it and the two suspects back to the highway patrol office. The $433,980 was then inserted into one of three identical, clean boxes, and placed in a separate inspection area. The dog was brought in to perform a second exterior sniff test, and, according to DiGiovanni, gave a positive alert for the narcotics on the box which contained the currency. DiGiovanni then contacted Timothy Whitaker ("Whitaker"), a Deputized Task Officer with the Drug Enforcement Agency ("DEA"), and relayed the details about the currency and its possible connection to drug trafficking. The DEA agreed to adopt the seizure of the currency.

DiGiovanni then interviewed Escobar a second time. Escobar told DiGiovanni that he was a native of Cali, Colombia; that he had entered the United States illegally five years ago; that the DEA had seized currency from him previously in New York City; and that he had been ordered deported to Colombia but not complied with that order. At the same time, Jones interviewed Rodriguez, who once more admitted that the seized currency belonged to him, but declined to answer further questions without an attorney present. Both men were then allowed to leave in Rodriguez's vehicle.

Troopers G.N. Taylor ("Taylor") and G.M. McNeil ("McNeil"), who were assisting DiGiovanni and Jones with the seizure, drove the $433,980 to the State Employees' Credit Union in Smithfield, NC. The cash was then converted into a money order payable to the United States Marshal Service, which McNeil and Taylor delivered to Whitaker. The money order was then deposited into the Department of Justice's Seized Asset Deposit Fund.

## PROCEDURAL HISTORY

The United States filed its Complaint for Forfeiture *in rem* on January 6, 2005; the Court reviewed an affidavit from Officer Whitaker and a Warrant of Arrest was issued for the currency that same day. A Discovery Plan was entered on May 17, 2005, which fixed the case's discovery deadline at September 30, 2005. Rodriguez has insisted from the outset that the $433,980 was acquired lawfully, through several years of personal savings while working as a limousine driver earning approximately $16,000 a year. However, he has declined to answer interrogatories and deposition questions from the United States about the source of the funds. Rodriguez based that refusal, among other things, on his lack of access to relevant government personnel and his privilege against self-incrimination. Rodriguez has also has not responded to certain other document requests relating to the manner in which he acquired the $433,980, but without making any particular objection or explanation. The United States filed its Motion to Compel Rodriguez to answer its outstanding document requests on October 12, 2005.

The United States moved for summary judgment on October 31, 2005, arguing that it had shown the currency to be subject to forfeiture by a preponderance of the evidence, and that Rodriguez's ongoing refusal to participate meaningfully in discovery had foreclosed him from controverting the Government's case. Rodriguez did not respond, but instead filed several other motions relating to DiGiovanni's stop of Rodriguez and the seizure of the $433,980. Specifically, Rodriguez on December 9, 2005 asked the Court to take judicial notice of the fact that most or all United States currency is contaminated by cocaine or other drug residue; to suppress the $433,980 as unlawfully obtained; and to preclude any evidence relating to the $433,980 in light of the Government's having deposited the funds without first allowing Rodriguez to subject the money to his own forensic testing.

On September 29, 2006, the Court denied Rodriguez's Motions to Take Judicial Notice, to Suppress and to Preclude; denied the United States' Motion to Compel without prejudice; and directed Rodriguez to respond to the United States' Motion for Summary Judgment. Rodriguez has since responded, and the United States has also filed a reply. Rodriguez argues that the Government's evidence is inadequate to carry its burden on summary judgment. He also repeats an argument which the Court previously rejected, namely that the reduction of the $433,980 to check form prevents him from rebutting the Government's case.

## DISCUSSION

A motion for summary judgment cannot be granted unless there are no genuine issues of material fact for trial. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must demonstrate the lack of a genuine issue of fact for trial, and if that burden is met, the party opposing the motion must "go beyond the pleadings" and come forward with evidence of a genuine factual dispute. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The Court must view the facts and the inferences drawn from the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Conclusory allegations are not sufficient to defeat a motion for summary judgment. *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.") (emphasis in original).

In a civil forfeiture action, the Government must demonstrate by a preponderance of the evidence that the currency is subject to forfeiture, either as proceeds of an illegal drug transaction, or as intended for use in an illegal drug transaction. 18 U.S.C. § 983(c) (2005); 21 U.S.C. § 881(a)(6). Specifically, the Government must show that there is a "substantial connection" between the currency and a drug offense. 18 U.S.C. § 983(c).[3]

**3.** The Civil Asset Forfeiture Reform Act of 2000 (CAFRA) raised the Government's proof standard from probable cause to a preponderance of the evidence in civil forfeiture cases. *See United States v. Mondragon*, 313 F.3d 862, 865 (4th Cir.2002) ("Before Congress enacted [CAFRA], the government's trial burden was to show probable cause for forfeiture ... Now, after CAFRA's enactment, the government must prove by a preponderance of the evidence that the property is subject to forfeiture.") (internal citations omitted). Both parties in this case cite to forfeiture cases which antedate CAFRA's passage, and thus appear to assume that these older opinions apply with equal force, notwithstanding the heightening of the Government's burden.

■ In this case the Government argues that the following evidence makes it more likely than not that the $433,980 was substantially connected to illicit drug trafficking: (1) seizure of the $433,980 on I–95 (a well known corridor for drug trafficking), during a journey from New York (a known destination city for drug trafficking) to Miami (a known source city for drug trafficking); (2) the unusually large quantity of currency; (3) the unusual packaging of the currency; (4) the two men's false and inconsistent statements, specifically Rodriguez's denial that any currency was in the vehicle, Escobar's varying explanations of his activities in the United States, and the two men's contradictory statements regarding their destination; and (5) the two positive K–9 alerts for narcotics, first alongside Rodriguez's car and then again at the Highway Patrol Office under more controlled conditions.[4]

Rodriguez's strategy on summary judgment has been to attack the sufficiency of the Government's case, by pointing out the ambiguities and potentially innocent explanations surrounding each of the above facts. Thus, Rodriguez says that traveling southbound from New York on I–95 does not suggest drug trafficking alone; that carrying a large amount of currency is not per se evidence of illicit activity; that packaging envelopes of cash in a cereal box with packing tape does not clearly reflect a connection to drug trafficking; and that false and conflicting statements

as to destination, ownership of the currency, and status in the United States show no direct link to any drug crime. Rodriguez also contends that the roadside K–9 alert is insignificant, in that the dog was likely responding to the presence of another dog's urine instead of indicating the presence of drug odor.

■ Isolated from one another, each of the facts relied upon by the Government could be characterized as only somewhat probative on the question of whether the defendant currency was substantially connected to a drug offense. However, it is not enough to point out possible problems with the separate factors underlying the Government's case, as all the evidence— both direct and circumstantial—can and should be evaluated by the Court as a whole. *See United States v. Thomas*, 913 F.2d 1111, 1115–117 (4th Cir.1990) (rejecting piecemeal dissection of Government's evidence in a civil forfeiture case, and requiring a review of totality of the evidence); *United States v. $124,700*, 458 F.3d 822, 826 (8th Cir.2006) (reversing district court's rejection of Government's forfeiture claim when "evidence as a whole demonstrate[d] by a preponderance of the evidence that there was a substantial connection between the currency and a drug offense.").[5]

Much of the briefing in this case has addressed the significance of the two K–9 alerts. In urging the Court to give strong

---

**4.** While the Government relied heavily upon the significance of the three cell phones, the recently-opened packing tape, and the map of Miami as evidence of DiGiovanni's reasonable suspicion to detain Rodriguez and Escobar, it has not emphasized that evidence in support of its case for a substantial connection between the currency and a drug offense.

**5.** *Thomas* was decided ten years before CAFRA, and in the years since the statute's enactment, the Fourth Circuit has not explicitly reaffirmed the totality of the circumstances

method as the proper approach in a case such as this one. While CAFRA raised the quantum of proof required in a forfeiture action, it did not purport to alter the way in which a court evaluates that proof; furthermore, other circuits have applied the totality of the circumstances test to forfeiture cases since CAFRA's passage. *See, e.g., $124,700*, 458 F.3d at 826. The Court thus applies the same totality of the circumstances test which the Fourth Circuit endorsed under the previous statutory regime.

probative weight to the K–9 sniffs, the Government has cited to cases which endorse expert testimony that drug sniffing dogs alert only to methyl benzoate, a chemical byproduct of the cocaine manufacturing process, and which also reject the theory that all circulating currency is tainted by narcotic odor. Those cases to one side, the Government has presented separate proof as to the K–9's reliability and the fast dissipation of the narcotic odor which it detects—Jones' testimony regarding his dog's certification and training to alert to the chemical makeup of narcotics, as well as his own training and experience with the K–9 in narcotics cases. Specifically, Jones testified both that *his* drug dog had been trained to alert to "the chemical makeup of narcotics," and that detectable odor ordinarily remains on suspect currency for only "a brief period of time" following contact with narcotics. Jones Dep. at 15–16, 17.

Because there is separate evidence of the K–9's reliability in this particular case, the Court need not and does not take a position on either the currency contamination theory or the general probative value of K–9 drug sniffs.[6] Understood in light of Jones' testimony, the K–9 sniffs raise an inference that the $433,980 carried by Rodriguez and Escobar had recently been exposed to illegal drugs. *See United States v. Funds in Amount of $30,670*, 403 F.3d 448 (7th Cir.2005) ("[I]t is likely that trained cocaine detection dogs will alert to currency only if it has been exposed to large amounts of illicit cocaine within the

very recent past."). That evidence, as well as the additional circumstantial proof discussed above (particularly the large amount of the currency as well as its unusual packaging) persuades the Court that it is more likely than not that the $433,980 was substantially related to a drug offense in which Rodriguez and Escobar had recently taken part. *See United States v. $84,615 in United States Currency*, 379 F.3d 496, 501–02 (8th Cir.2004) ("possession of a large amount of cash . . . is strong evidence that the cash is connected with drug activity"); *United States v. $124,700 in United States Currency*, 458 F.3d 822, 826 (8th Cir.2006) (noting that transportation of over $100,000 in cash, wrapped in aluminum foil and concealed in a cooler, supported substantial connection between seized currency and drug offense).

■ The burden thus shifts to Rodriguez, who must come forth with some affirmative evidence that the defendant currency is not subject to forfeiture as proceeds of a drug transaction. *United States v. $95,945.18 in United States Currency*, 913 F.2d 1106, 1111 (4th Cir.1990) (stating that when the Government has met its evidentiary burden on summary judgment, the claimant must "come forward with specific facts showing that there is a genuine issue for trial.") (internal citations omitted).

Rodriguez says that he acquired the $433,980 lawfully, through several years of personal savings while employed as a lim-

---

**6.** While Rodriguez previously asked the Court to take judicial notice of the fact that almost all circulating currency is contaminated by narcotic odor, he did not advance a currency contamination argument at the summary judgment phase. Beyond his assertion that the first K–9 alert was a reaction to another dog's urine—an argument obviated in any event by the second K–9 alert, which took place later in time and under more con-

trolled conditions—Rodriguez has presented no evidence to suggest that the K–9 sniffs in this case, or K–9 sniffs more generally, were inaccurate. Rather, he merely repeats the argument which the Court rejected in its September 28, 2006 Order—that the Government improperly destroyed evidence by converting the sniffed currency to check form before he could subject the money to forensic testing.

ousine driver. Yet, as discussed above, Rodriguez has refused to answer any questions or produce evidence that he in fact obtained the $433,980 in that way. Without either affidavits or similar proof (other than argumentation in his pleadings or unsupported assertions during his deposition), Rodriguez simply cannot carry his burden, especially considering his employment and financial circumstances during the years leading up to the currency's seizure. In his deposition, Rodriguez refused to be cross-examined on his acquisition of the currency, invoking his Fifth Amendment privilege against self-incrimination whenever questioned on the issue by the Government's attorney. Rule 56 precludes Rodriguez from manufacturing a genuine issue of material fact by selectively invoking Fifth Amendment protection "for the limited purpose of making statements to support a summary judgment motion." *In Re Edmond,* 934 F.2d 1304, 1308 (4th Cir.1991); *see also Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.").

His failure to offer evidence in the face of the Government's presentation of sufficient proof precludes Rodriguez from demonstrating the existence of a factual dispute within the meaning of Rule 56(c) of the Federal Rules of Civil Procedure. The Government's Motion for Summary Judgment will be GRANTED.

### CONCLUSION

The United States' Motion for Summary Judgment is GRANTED.

SO ORDERED.