**UNITED STATES of America,**
**Plaintiff,**

v.

**$78,850.00 in UNITED STATES**
**CURRENCY, Defendant.**

**C.A. No. 2:05–1752–PMD.**

United States District Court,
D. South Carolina,
Charleston Division.

July 25, 2007.

Lee Ellis Berlinsky, U.S. Attorneys Office, Charleston, SC, for Plaintiff.

## ORDER

PATRICK MICHAEL DUFFY, District Judge.

This matter is before the court upon the Claimants' Motion for Summary Judgment. For the reasons set forth herein, the court denies the Claimants' Motion.

## BACKGROUND

The facts, considered in the light most favorable to the nonmoving party, are as follows:

This is a civil action *in rem* brought pursuant to the provisions of 18 U.S.C. § § 981(a)(1)(A) and (C), and 21 U.S.C. § 881(a)(6). Specifically, the United States seeks the forfeiture of $78,850.00, seized from Luis Muñoz ("Muñoz") and Jose Edwin Gomez Serna ("Gomez") by Deputy Joseph Burnette ("Burnette") of the Dorchester County Sheriff's Office during the traffic stop of a freightliner on Interstate 95 in St. George, South Carolina.[1] In the complaint, the United States seeks the forfeiture of this money based upon reasonable cause that it is traceable to the following: (1) proceeds furnished or intended to be furnished in exchange for controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846; (2) property involved in money laundering activities in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i); (3) property involved in illegal money transmitting business in violation of 18 U.S.C. § 1960; (4) property involved in currency reporting violations in violation of 31 U.S.C. § 5313(a); and/or (5) proceeds of some other form of specified illegal activity set forth in 18 U.S.C. § 1956(c)(7). (Compl. at 1, 2.)

On December 16, 2004, Burnette conducted a traffic stop of a blue freightliner for following another vehicle too closely. Muñoz and Gomez were the occupants of the vehicle, which was registered to Betancur. Burnette asked Muñoz what he was transporting, and Muñoz told him motorcycles. In addition, Burnette asked Muñoz if he could look in the back of the truck, and Muñoz responded in the affirmative. Burnette then advised Muñoz he was going to issue a warning ticket and explained that a warning was just a "nice way" of saying "be careful." Burnette asked if there was anything illegal in the truck, and Muñoz answered "no." Burnette also asked Muñoz, ¿Puedo registrar? ("May I search?"), to which Muñoz replied in the affirmative. Burnette and Charleston County Deputy Allen Williams ("Williams") then searched the vehicle, and Burnette told Muñoz that they were going to "put the dog around the truck." Williams walked K9 Faxx around the truck, and Faxx alerted to the exterior of the trailer and the exterior of the cab. Williams next took Faxx inside the cab, where Faxx alerted again to a tan suitcase, black duffel bag, and the sleeper of the cab. The officers then discovered a sum of money, and the Government described how the $78,850 was found:

(a) 10 bundles of currency bound by rubber-bands in a black plastic bag adding up to $19,600.00, concealed inside a tan-colored suitcase owned by Munoz along with numerous scented candles and numerous cans of disinfectant spray;

---

1. In the complaint, the United States acknowledges that Henry Wilson Betancur ("Betancur") may have or claim an interest in the property by virtue of being the record title owner of the vehicle from which Deputy Burnette seized the money. (Compl. at 3.) Although the court previously identified the Claimants in this case as Betancur and HB Transport & Freight Corporation ("Claimants"), apparently Muñoz is also a claimant.

(b) 6 bundles of U.S. currency bound by rubber-bands and concealed loosely inside of a black-colored Polo brand duffle bag adding up to $47,000.00, owned by Munoz along with items of clothing owned by Munoz;

(c) various bundles of U.S. currency bound by rubber-bands adding up to $12,250.00, and concealed in a white-colored plastic shopping bag identified with markings of a local drug store known as "Duane–Read" found in a compartment above the passenger seat area.

(Am. Resp. in Opp'n at 3–4.) Burnette detained Muñoz and Gomez, transporting them with the currency to the police station for questioning. State officials then called the Drug Enforcement Agency ("DEA"), and about an hour and a half after the traffic stop, DEA Special Agents Mark Willis ("Willis"), Olenthial Faison ("Faison"), and Johnny Orr ("Orr") arrived to question Muñoz and Gomez and to seize the truck and currency. After questioning, Muñoz and Gomez were free to go without the truck and currency. Though Faxx alerted to the freightliner, no drugs or drug paraphernalia were found on Muñoz or Gomez or in the freightliner. Although not clear exactly when, the DEA released the truck after January 7, 2005, and on March 2, 2005, the DEA notified Betancur the DEA had seized the $78,850 for forfeiture. The United States filed the instant forfeiture lawsuit on June 17, 2005, and Claimants filed a Motion for Summary Judgment on February 9, 2007. Claimants argue they are entitled to summary judgment "because there is no evidence to prove by a preponderance of the evidence that the seized currency is substantially connected to illegal activity." (Mot. for Summ. J. at 1.)

## STANDARD OF REVIEW

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party 'is particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

## DISCUSSION [2]

Title 18, United States Code, section 983 states, in relevant part,

---

2. The Government seems to assert that the court's Order dated August 1, 2006 "pro-

**(c) Burden of proof.**—In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property—

(1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture;

(2) the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture; and

(3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.

18 U.S.C. § 983(c). This provision was added to the Code by the Civil Asset Forfeiture Reform Act of 2000, Pub.L. No. 106–185, 114 Stat. 202.[3] In *United States*

vide[s] direction and reliance in support of its position in seeking a denial" of Claimants' Motion to Suppress. (Resp. in Opp'n to Mot. to Suppress at 8 n. 2.) That order addressed Claimants' Motion to Dismiss, and the court stated,

> [I]n the present case, the government's complaint includes, *inter alia*, the following allegations: (1) the amount of money seized; (2) the manner in which the currency was packaged; (3) that it was seized during a search that followed a routine traffic stop; (4) where the officers found the currency; (5) which officers seized the currency; (6) that Muñoz and Gomez told inconsistent stories; (7) that the truck contained a non-factory hinge which led to a hidden compartment; (8) that the drug dog alerted to the hidden compartment; (9) that the officers found what appeared to be a "tally sheet"; (10) that the date on the bill of lading had been tampered with; and (11) that officers found several black plastic bags containing candles and approximately eight cans of disinfectant spray inside the tan suitcase. Because these allegations, when taken together, permit a reasonable belief for pleading purposes that the currency was the proceeds of drug trafficking and was therefore subject to forfeiture, the court finds that the government has satisfied Rule E(2)(a)'s pleading requirement, and therefore, the complaint is sufficient to withstand the claimants' Rule 12(b)(6) motion to dismiss.

*United States v. $78,850.00 in U.S. Currency*, 444 F.Supp.2d 630, 639 (D.S.C.2006) (internal quotation marks omitted). In the 2006 order, the court was evaluating a Motion to Dismiss pursuant to Rule 12(b)(6). Thus, if the Government is arguing that the 2006 or-

der helps it with respect to the Motion for Summary Judgment, the court disagrees—determining the Government's complaint meets the pleading requirement of Rule E(2)(a) does not lead to a determination the Government has made the requisite showing of connection with illegal activity.

3. Before enactment of this law, the standard was somewhat different:

> In forfeiture proceedings pursuant to [21 U.S.C. § 881(a)(6)], the government has the initial burden of demonstrating probable cause for the belief that a substantial connection exists between the property to be forfeited and the criminal activity defined by statute. The burden then shifts to the claimant to establish, by a preponderance of the evidence, that the property was not acquired in violation of the law or otherwise linked to illegal drug activity. If upon rebuttal the claimant is unable to demonstrate that the property was not involved with drug activity, a showing of probable cause alone will support a judgment of forfeiture.
>
> "Probable cause" for the purpose of forfeiture proceedings is the same standard used in search and seizure cases.

*United States v. Thomas*, 913 F.2d 1111, 1114 (4th Cir.1990) (internal quotation marks and citations omitted). The standard required by the Civil Asset Forfeiture Reform Act of 2000, however, is higher, requiring proof by a preponderance of the evidence. *See United States v. McHan*, 11 Fed.Appx. 304, 308 n. * (4th Cir.2001) ("Among other things, the [Civil Asset Forfeiture Reform Act of 2000] reallocates the burden of proof so that the government must now establish, by a *preponderance*

*v. One Parcel of Real Estate Located at 7715 Betsy Bruce Lane,* 906 F.2d 110 (4th Cir.1990), the Fourth Circuit found the Government established *probable cause* the that house was used or intended to be used to facilitate a crime. *One Parcel,* 906 F.2d at 112–13. The court so found because there was evidence that Modlin, the homeowner, distributed cocaine in his house and that he used his home to store, prepare, package, and consume cocaine. *Id.* at 113. "The fact that only trace amounts of cocaine were found in the house does not prevent a finding of probable cause that Modlin distributed cocaine or used his house to facilitate a violation of Title 21. The government is entitled to the reasonable inferences to be drawn from the evidence." *Id.* In a different case, the Fourth Circuit found the Government established *probable cause* on the following facts: an undercover officer arranged a sale of six kilograms of cocaine; the claimant's production of "an exceptional amount of cash in small bills, which was represented to be the consideration for the drugs, to his companion, who had arranged the sale;" and that the companion gave the bag to the officer, who was a total stranger. *Id.* at 110–11. "Given that [the claimant] had little income and no bank account, and advanced no reason for why he should be carrying such a large amount of money in a bowling bag, the government has shown far more than just a probability that the cash was being used to finance a cocaine transaction." *Id.* at 111.

The United States District Court for the Eastern District of North Carolina confronted a situation similar to the factual situation in the case *sub judice.* In *United States v. $433,980 in U.S. Currency,* 473 F.Supp.2d 685 (E.D.N.C.2007), a police officer observed claimant's vehicle change lanes abruptly and begin driving close behind another vehicle on I–95. *$433,980,* 473 F.Supp.2d at 686. During the stop, the driver stood in front of the patrol car, and the claimant's passenger remained seated in the claimant's vehicle. *Id.* While the claimant was retrieving his license and proof of registration, the officer observed three cell phones, a roll of clear packaging tape, and a map of Miami, Florida. *Id.* When the claimant opened the glove box, the officer saw a new screwdriver set and a pair of pliers. *Id.* Responding to the officer's questions, the claimant stated he had been a resident of the United States for five years, was self-employed as a cab driver, and was traveling to visit friends in Jacksonville, Florida. *Id.* The officer asked similar questions of the passenger; the passenger first told the officer he had lived in Queens for three years and did not have a work visa, but then he told the officer that he was on vacation in the United States. *Id.* at 686–87. The passenger also told the officer that he and the claimant were traveling for vacation and that their destination was Miami. *Id.* at 687. Both the claimant and the passenger were visibly nervous. *Id.*

The officer asked the claimant to sit in his patrol car, and then he issued a courtesy warning for following too closely and told the claimant he was free to leave. *Id.* Before the claimant exited the patrol car, the officer asked the claimant for permission to ask more questions about the trip to Florida, and the claimant agreed. *Id.* The officer then told the claimant he was suspicious, pointing out the inconsistency in the two stories. *Id.* The officer asked if there were any weapons, drugs, United States currency, or specially designed storage compartments on the car, and the claimant answered each question in the

*of the evidence* [as opposed to probable cause], that the property is subject to forfei-

ture."); *see also Unites States v. Mondragon,* 313 F.3d 862, 865 (4th Cir.2002).

negative. *Id.* At this point, the officer obtained from the claimant both written and oral consent to search the vehicle. *Id.*

On searching the vehicle, the officer found a large Frosted Flakes cereal box sealed with black electrical tape; the box contained a large amount of United States currency. *Id.* at 687–88. Further search revealed two additional boxes containing manilla envelopes stuffed with currency. *Id.* at 688. The passenger denied all knowledge of the currency, but despite his earlier denial, the claimant then acknowledged the money belonged to him. *Id.* At the highway patrol office, the currency was placed in one of three identical, clean boxes, and a drug dog positively alerted for narcotics on the box containing the currency. *Id.* The United States filed a motion for summary judgment, but the claimant argued the Government's evidence was inadequate to carry its burden. *Id.* at 689.

The Government argued the following evidence "makes it more likely than not" that the currency was "substantially connected to illicit drug trafficking":

(1) seizure of $433,980 on I–95 (a well known corridor for drug trafficking), during a journey from New York (a known destination city for drug trafficking) to Miami (a known source city for drug trafficking);

(2) the unusually large quantity of currency;

(3) the unusual packaging of the currency;

(4) the two men's false and inconsistent statements, especially [the claimant's] denial that any currency was in the vehicle, [the passenger's] varying explanations of his activities in the United States, and the two men's contradictory statements regarding their destination; and

(5) the two positive K–9 alerts for narcotics, first alongside [the claimant's] car and then again at the Highway Patrol Office under more controlled conditions.

*Id.* at 690. The claimant asserted "potentially innocent explanations" for each of those facts. *Id.* However, the United States District Court for the Eastern District of North Carolina granted the United States' Motion for Summary Judgment:

Isolated from one another, each of the facts relied upon by the Government could be characterized as only somewhat probative on the question of whether the defendant currency was substantially connected to a drug offense. However, it is not enough to point out possible problems with the separate factors underlying the Government's case, as all the evidence—both direct and circumstantial—can and should be evaluated by the Court as a whole.

Much of the briefing in this case has addressed the significance of the two K–9 alerts.... [T]he Government has presented separate proof as to the K–9's reliability and the fast dissipation of the narcotic odor which it detects—Jones' testimony regarding his dog's certification and training to alert to the chemical makeup of narcotics, as well as his own training and experience with the K–9 in narcotics cases. Specifically, Jones testified both that *his* drug dog had been trained to alert to the chemical makeup of narcotics, and that detectable odor ordinarily remains on suspect currency only for a brief period of time following contact with narcotics.

Because there is separate evidence of the K–9's reliability in this particular case, the Court need not and does not take a position on either the currency contamination theory or the general probative value of K–9 drug sniffs. Understood in light of Jones' testimony, the K–9 sniffs raise an inference that the

$433,980 carried by [the claimant and the passenger] had recently been exposed to illegal drugs. That evidence, as well as the additional circumstantial proof discussed above (particularly the large amount of the currency as well as its unusual packaging) persuades the Court that it is more likely than not that the $433,890 was substantially related to a drug offense in which [the claimant and the passenger] had recently taken part.

*Id.* at 690–91 (internal quotation marks and citations omitted). The court then stated the burden shifts to the claimant, "who must come forth with some affirmative evidence that the defendant currency is not subject to forfeiture as proceeds of a drug transaction." *Id.* at 691. Although the claimant asserted he acquired the $433,980 lawfully as a limousine driver, he refused to answer any questions or produce evidence that he did, in fact, obtain the money in that manner. *Id.* The court thus granted the United States' Motion for Summary Judgment. *Id.* at 692.

Despite the Eastern District of North Carolina's holding, other circuits have found *probable cause* lacking on similar facts. For example, in *United States v. Ten Thousand Seven Hundred Dollars and No Cents ($10,700.00) in United States Currency,* 258 F.3d 215 (3d Cir. 2001), the Third Circuit examined whether the Government had probable cause to commence forfeiture proceedings. In *$10,700,* Officer McManus stopped a rented vehicle that was speeding on I–285 in Delaware. *$10,700,* 258 F.3d at 218. There were three individuals in the vehicle: Whitfield, the driver; claimant Thomas, a passenger in the front seat; and claimant Johnson, a passenger in the back seat. *Id.* at 219. The officer questioned the group individually about their travel plans; Whitfield said they were going shopping but he was not sure where, and the other two indicated they were going to New Jersey to visit family. *Id.* The officer then obtained consent to search the vehicle, and she noticed a strong odor of air freshener but found no weapons or contraband. *Id.* In the trunk, the officer found a black duffel bag and a blue backpack. *Id.* Johnson claimed ownership of the backpack, and inside the bag was "a blue plastic bag, and inside the blue plastic bag was another blue plastic bag tied at the top. Inside the interior blue plastic bag was an unknown amount of United States currency rubber-banded together." *Id.* Johnson claimed ownership of the money, asserting the group was en route to buy a car. *Id.* Thomas claimed ownership of the duffel bag, and in that bag was another bundle of currency packaged in much the same way as that in the backpack. *Id.* Other currency was found on Thomas' and Johnson's person. *Id.* at 219–20.

The officer called the car rental agency and found that pursuant to the lease agreement, the vehicle was not to be driven north of the Virginia border. *Id.* at 220. The officer also learned from a North Carolina officer that each of the men lived in an area known for high drug activity, and Johnson had murder charges pending against him. *Id.* Thomas had previously been convicted of one drug offense, and Johnson had been convicted of several drug offenses. *Id.* A canine test was performed, and the dog indicated positively on the currency but negatively on the interior and exterior of the vehicle. *Id.* The claimants were not charged with any illegal activity other than the traffic citations and were allowed to leave. *Id.*

Claimants Johnson and Thomas filed a motion for summary judgment, arguing the evidence was insufficient to satisfy the Government's "threshold burden of establishing probable cause to institute forfei-

ture proceedings." *Id.* at 221. The district court denied the claimants' motion for summary judgment, finding the totality of the information was sufficient to establish probable cause that the currency was subject to forfeiture pursuant to § 881(a)(6). *Id.* In reversing the district court, the Third Circuit stated,

> In determining whether the government's proofs are sufficient to pass the probable cause threshold, we point out initially that the facts of this case do not present the "typical" forfeiture scenario we have previously addressed under § 881(a) in which the claimants' property, real or personal, can be linked to a narcotics violation because the property was seized as a consequence of a police investigation, arrest or conviction for an underlying drug crime. Moreover, this case is also unusual because the government has not presented any evidence whatsoever from which it could be inferred that claimants were involved in any drug exchange at or around the time the government instituted forfeiture proceedings. As a matter of logic, circumstantial evidence implicating claimants in *recent* drug activities, such as, for example, evidence of claimants' contemporaneous affiliation with known drug traffickers, or claimants' possession of drugs or drug paraphernalia at the time of the seizure, would support the government's theory that the money in claimants' possession is connected to illegal drug trafficking. If presented by the government, such evidence would have provided a strong, albeit inferential, present link between claimants' currency and the drug trade, and would have provided a more compelling case for forfeiture under § 881(a)(6). Here, however, the government does not dispute that [the officer] did not find drugs or drug paraphernalia in claimants' vehicle, and it does not point to any reliable evidence of a similar nature from which it can be inferred that claimants were involved in drug activities at or around the time the government seized the currency and filed the forfeiture complaint.

*Id.* at 223–24. After noting the Government need not link the currency to a "particular identifiable illicit drug transaction," the court stated, "Nevertheless, the quality of the circumstantial evidence that the government does proffer to establish probable cause to institute forfeiture proceedings must be strong enough to support reasonable grounds for belief that an actual, rather than purely theoretical, connection exists between the currency in claimants' possession and the drug trade." *Id.* at 225. In the view of the Third Circuit, "the government's proofs, even when considered in the aggregate, simply are not strong enough to establish probable cause to believe that there had been, or was about to be, a violation of the drug laws involving this currency." *Id.*

In an unpublished opinion, the Fourth Circuit took a different view on probable cause. *See United States v. Puche–Garcia,* 230 F.3d 1356 (4th Cir.2000) (unpublished table decision). In that case, police stopped a vehicle for a traffic violation, and after the officer issued a warning citation, he asked the driver whether he had any large amounts of United States currency, narcotics, or firearms in the car. *Puche–Garcia,* 230 F.3d 1356, 2000 WL 1288181, *1. The driver answered in the negative and consented to a search of the vehicle and the two suitcases in the trunk. *Id.* The passenger unlocked one of the suitcases, and doing so revealed "large amounts of U.S. currency in small denominations wrapped in stacks with rubber bands." *Id.* Shortly thereafter, a drug dog gave a positive alert for controlled substances on both suitcases. *Id.* On being questioned, the driver indicated he did not know who

the money belonged to but that he was supposed to take it back to Venezuela. *Id.* The driver stated that he was driving the rental car from New Jersey to Miami in order to buy merchandise for his business. *Id.* He also indicated that he had received a phone call at his hotel in New Jersey telling him where to pick up the packages (containing the money) and that he believed he would receive a phone call in Florida telling him where to deliver the money. *Id.* Although he claimed he was in the business of buying and selling appliances, he had no documents or papers indicating he was in that business. *Id.* at *2. The lower court denied the claimants' motion for summary judgment and granted the Government's motion for summary judgment. *Id.* at *6.

On appeal, the Fourth Circuit affirmed the lower court's denial of the claimants' motion for summary judgment. *See id.* at *6. The court noted the following factors supported a finding of *probable cause* for forfeiture: (1) the "fact that most of the money consisted of small denominations bundled with rubber bands"; (2) the "concealment of money (in socks and elsewhere)"; (3) carrying "unusually large amounts of cash"; (4) an "evasive, confused explanation for carrying a large sum"; (5) carrying cash from an unknown owner to an unknown recipient; and (6) a "positive alert by a police dog on a cache of money." *Id.* at *4 (internal quotation marks omitted). The Fourth Circuit affirmed the denial of the claimants' motion for summary judgment because "[t]he totality of the facts ... points to the conclusion that the government established probable cause to connect the money in Puche–Garcia's rental car to illegal drug activity." *Id.*

The Fourth Circuit's opinion in *Puche–Garcia* indicates it would not likely have agreed with the Third Circuit's opinion of *$10,700.00,* 258 F.3d 215 (3d Cir.2001). Because *Puche–Garcia* was decided under the probable cause standard, it is uncertain whether the Fourth Circuit would have affirmed the denial of the claimants' motion for summary judgment under the preponderance of the evidence standard. However, using the Eastern District of North Carolina's opinion in *$433,980* as a guide, the court denies Claimants' Motion for Summary Judgment. *See $433,980,* 473 F.Supp.2d 685 (E.D.N.C.2007). The factors considered indicative that the currency was more likely than not substantially connected to illicit drug trafficking by the court in *$433,980* are very similar to the facts in the case *sub judice.* First, police seized $78,850 on I–95 as Muñoz and Gomez were traveling from New York to Miami. Furthermore, this $78,850 was unusually packaged: it was found in three separate bags, and each bag contained various bundles of currency bound by rubber bands. In addition, as Burnette testified at the hearing on the Motion to Suppress, Muñoz and Gomez gave inconsistent statements to police, and when asked if there was "mucho dinero" in the truck, Muñoz said no. Lastly, K9 Faxx positively alerted for narcotics: (1) on the trailer of the freightliner around the after-market compartment; (2) on the exterior of the cab; and (3) in the interior of the cab, on two bags and the sleeper portion of the cab. Although no drugs were found in the freightliner, Faxx's alerts are probative of whether or not the currency was more likely than not substantially connected to illicit drug trafficking in light of the testimony, at the hearing on the Motion to Suppress, about Faxx's reliability. Specifically, Williams testified he and Faxx have trained together in excess of 1,000 hours and that Faxx has numerous certifications as a drug detecting dog. Faxx is trained to detect the odor of marijuana, cocaine, heroine, and methamphetamine, but he is

not trained to detect the odor of currency. Williams testified that in 2006, Faxx performed 106 sniffs, giving forty-six positive alerts. Of those forty-six positive alerts, drugs were found thirty-seven times, and only currency was found on nine occasions. Williams also testified that he performs tests with Faxx on uncontaminated currency to ensure that Faxx is not alerting to the odor of currency. Faxx alerted to the locked tan suitcase, which, in addition to containing $19,600.00, contained numerous scented candles and cans of disinfectant spray. The court finds that this evidence, considered with the other circumstances such as the false entry in the driver's log book, the altered bill of lading with "Miami" misspelled, the presence of an aftermarket compartment on the freightliner, and the piece of paper appearing to be a tally sheet, posits a genuine issue of material fact as to whether the property is subject to forfeiture.[4] Thus, considering the evidence in the light most favorable to the nonmoving party, the Government, the court denies Claimants' Motion for Summary Judgment.

## CONCLUSION

It is therefore **ORDERED,** for the foregoing reasons, that Claimants' Motion for Summary Judgment is **DENIED.**

**AND IT IS SO ORDERED.**

---

4. Claimants made a point at the hearing on the Motion to Suppress that the truck was used for legitimate business and was at the time of the stop carrying motorcycles. This does not preclude use of the truck, especially the smaller areas to which K9 Faxx alerted, for transportation of illegal drugs. Nor does it explain why the occupants had such a large sum of cash. While it is not unusual in the South to sell vegetables or fruit from a truck, it would be highly unusual to sell motorcycles for cash from a truck. The Court further notes it would be highly unusual for any legitimate business to entrust such an amount of cash to truck drivers, especially those who claim not to fully understand English.