UNITED STATES of America, Plaintiff,

v.

$107,840.00 IN U.S. CURRENCY, more or less, Defendant,

Errett Pusey, Claimant.

No. 1:09-cv-036.

United States District Court, S.D. Iowa.

April 29, 2011.

Maureen McGuire, U.S. Attorney's Office, Des Moines, IA, for Plaintiff.

## ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court is a Motion for Summary Judgment, filed by the Government on January 21, 2011. Clerk's No. 9. Errett Pusey ("Claimant") filed a Response on February 14, 2011. Clerk's No. 11. On March 1, 2011, the Government filed a Reply. Clerk's No. 14. Claimant also filed a Motion to Suppress on March 11, 2011. Clerk's No. 16. The Government filed a Response to the Motion to Suppress on March 15, 2011, and a Supplemental Response on March 17, 2011. Clerk's Nos. 17, 18. On March 18, 2011, the Court held a hearing on the Government's Motion for Summary Judgment and the Claimant's Motion to Suppress. Clerk's No. 19. The matters are fully submitted.

## I. FACTUAL BACKGROUND

### A. *The Traffic Stop*

On April 9, 2009, Claimant was driving a rented pickup truck west on Interstate 80 with a four-wheel recreational vehicle secured to the truck bed. *See* Gov't State-ment of Material Facts Not in Dispute (hereinafter "Gov't Facts") (Clerk's No. 9.2) ¶ 1. As he approached Council Bluffs, Iowa, Claimant was stopped for speeding by police officer Kenneth Haas (hereinafter "Officer Haas"). *See id.* During the stop, while sitting in Officer Haas' police vehicle, Claimant informed Officer Haas that he had flown to Maryland from his home in San Francisco, California and was in the process of driving back. *See id.* ¶ 4. He also explained that, although the rental agreement stated that the vehicle was to be returned to Maryland, Claimant planned on returning it to California. *See id.* After issuing Claimant a warning for speeding, Officer Haas told him that he "was free to go." *See* Br. in Supp. of Mot. to Suppress (hereinafter "Suppression Br.") (Clerk's No. 16.1) at 1.

As Claimant began to walk back to his vehicle, Officer Haas asked him if he had any controlled substances or large sums of money in his vehicle. *See* Video Recording of Traffic Stop (hereinafter "Recording") at 8:52.[1] Claimant replied that he did not. *See id.* Officer Haas then asked permission to search Claimant's vehicle. *Id.* Claimant replied, "No, that's fine, I'd just like to get on my way, but if you want to, yeah." *Id.* Officer Haas asked him again if it was alright if he searched the vehicle. Claimant replied, "Well, I don't, it's fine. I'd just rather save the time to be honest with you, there's nothing for you to find." *Id.* Officer Haas then stated that he would work as quickly as possible, to which Claimant replied, "okay." *Id.*

Officer Haas next asked Claimant if he would sign a form consenting to the search. *Id.* at 8:53. While Claimant was signing the form, he asked Officer Haas what would happen if he refused to con-

---

**1.** The Recording is Ex. 5 of Claimant's App. to Resistance to Mot. for Summ. J. (Clerk's No. 11.4).

sent to the search. *Id.* at 8:55. Officer Haas replied that Claimant was free to do so, and if he did refuse, then "what I would do is ask you to let me run a dog around the vehicle." *Id.* at 8:55–56. Claimant signed the consent to search form. *Id.* at 8:58. Claimant also consented to a pat-down search of his person. *Id.* Officer Haas conducted the pat-down search, but did not find any contraband. *Id.* at 8:59. Claimant then waited in the back seat of Officer Haas' vehicle while Officer Haas and several other officers searched Claimant's vehicle. *Id.*

After searching the vehicle for approximately five minutes, one of the officers found a blank prescription pill bottle with an unidentified pill in it. *Id.* at 9:03. The officers suspected that the pill was ecstasy. *Id.* However, Claimant informed the officers that it was Suboxone.[2] *Id.* at 9:04. He stated that a friend had given him the pill because he had recently stopped using heroin. *Id.* He also said that he did not have a prescription for the pill, although he did not believe that one was necessary. *Id.* at 9:05. At this point, one of the officers placed Claimant in handcuffs as the other officers continued searching his vehicle. *Id.*

Approximately twenty-five minutes into the search, officers found $104,840.00 in Claimant's suitcase (hereinafter the "defendant currency" or "currency").[3] *Id.* at 9:26. The money was hidden behind a velcro liner which created a false side to

the suitcase. *See* Gov't Facts ¶ 7. The money was heat-sealed in plastic packaging. *Id.* Also, at some point during the search, the officers located five empty snowboard bags in Claimant's vehicle. *See* Gov't App. to Mot. for Summ. J. (hereinafter "Gov't App.") at 37. The officers seized Claimant's vehicle and all its contents.

After discovering the currency, Officer Haas read Claimant a *Miranda*[4] warning and transported him to the police station for questioning. *See* Recording at 9:32–33. On the way to the police station, Officer Haas informed Claimant that he would be verifying the information that Claimant had provided, including his flight records. *Id.* at 9:39. In response, Claimant indicated that, although he had originally told Officer Haas that he flew from California to Maryland, he had actually driven. *Id.* Claimant stated that he told Officer Haas he had flown because "it's weird to drive and not fly." *Id.* Claimant also told Officer Haas that he lied about having currency in his vehicle because "I honestly did not know if that was legal." *Id.* at 9:39–40.

### B. *Post–Traffic Stop*

While at the police station, Claimant was interviewed by Drug Enforcement Administration Task Force Officer Brandon West ("Officer West"). Claimant informed Officer West that he drove from California to Maryland. *See* Gov't Facts ¶ 5. During his deposition, however Claimant stated that

---

2. Suboxone is "a combination of buprenorphine and naloxone. Buprenorphine is an opioid medication. Buprenorphine is similar to other opioids such as morphine, codeine, and heroin however, it produces less euphoric ('high') effects and therefore may be easier to stop taking." *Sylvester v. Comm. of Social Sec.*, No. 10–1012, 2011 WL 470257, at *3 n. 5 (W.D.Pa. Feb. 4, 2011) (slip copy) (internal citations omitted). Suboxone is often prescribed to assist an individual in overcoming drug addiction. *Id.* at *3.

3. Another $3,000.00 was found inside a glove that was on the floor of Claimant's vehicle. This money was not located during the initial search of Claimant's vehicle, but only after Claimant disclosed its location to Officer Haas. Recording. at 9:40.

4. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

he had actually flown to Maryland from California, and was in the process of driving back to California when he was stopped by Officer Haas. *See id.* ¶ 6; Gov't App. at 30–32. Also, while Claimant was detained, a trained canine narcotics detection officer (hereinafter "drug dog") was deployed on the currency seized from his vehicle. *See* Gov't Facts ¶ 9. The drug dog alerted to the odor of narcotics on the currency. *See id.* Officer Jerod Clyde ("Officer Clyde"), who handled the drug dog used in this case, stated that the dog also alerted to the scent of narcotics on the snowboard bags that were found in Claimant's vehicle. *See* Gov't App. at 43.

### C. Sources of the Currency

Claimant explained that he acquired the currency from a number of sources. *See* Claimant's App. to Resistance to Mot. for Summ. J. (hereinafter "Claimant's App.") (Clerk's No. 11.4) at 18. Specifically, Claimant noted that after inheriting his father's home, he found approximately $50,000 buried in the backyard, and found an additional $12,000 hidden in the home (hereinafter referred to collectively as "Father's Money"). *See* Gov't Facts ¶ 10; Claimant's App. at 24–25. Claimant stated that his father had been burying money for an unknown period of time, but stopped in 1998.[5] *See* Gov't Facts ¶ 10. Claimant also stated that after finding the money, he placed it under the stairs in his home for safekeeping. *See* Claimant's App. at 23. Although the Government has not disputed that Claimant found his Father's Money, it did note that only $6,020 worth of the defendant currency consisted of bills that were dated prior to 1998, and that many of the bills were dated from 2004–2006. *See* Gov't Facts ¶ 11. In re-

sponse, Claimant states that he would occasionally use his Father's Money, and then replace the portions he used with (presumably) newer currency. *See* Claimant's Statement of Additional Material Facts Not in Dispute (hereinafter "Claimant's Facts") (Clerk's No. 11.2) ¶ 18.

Claimant stated that the rest of the currency came from a combination of a $10,000 life insurance policy he received upon his father's death, various jobs he held, money earned by fixing and selling used cars, money made from renting out his father's home, and from a $40,000 bank loan. *See* Claimant's App. at 18–20, 22, 26. Claimant's bank records show that he did receive a $40,000 loan, and that approximately $26,000 of the loan was withdrawn as cash, while the remaining amount was spent on point-of-sale purchases. *See* Gov't App. at 41. Also, Claimant's tax records indicate that he earned approximately $58,533 between 2000 and 2009. *See* Gov't Facts ¶¶ 13–15.

Based on these facts, the Government seeks forfeiture of the defendant currency pursuant to Supplemental Rule G(2) of the Federal Rules of Civil Procedure and 21 U.S.C. § 881(a)(6). Clerk's No. 1. The Government has moved for summary judgment on the Complaint, and Claimant has moved to suppress all evidence obtained during the April 9, 2009 traffic stop, including the defendant currency, from this forfeiture proceeding.

### II. MOTION TO SUPPRESS

Claimant's Motion to Suppress[6] seeks to exclude the use of all evidence seized from his vehicle, as well as certain statements he made during the April 9, 2009 traffic

---

**5.** Claimant's father died in 1999. Gov't App. at 4.

**6.** Claimant originally raised these suppression issues in his Resistance to the Government's

Motion for Summary Judgment. *See* Clerk's No. 11. However, after the Government objected, arguing that it was improper to raise a suppression issue in a response brief, Claimant filed his current Motion to Suppress.

stop, based on alleged violations of his Fourth and Fifth Amendment rights. Specifically, Claimant argues that Officer Haas unreasonably searched his vehicle, in violation of the Fourth Amendment, because Claimant's consent to the search was involuntary. Claimant also argues that he was unreasonably detained, in violation of both the Fourth and Fifth Amendments, when officers placed him in handcuffs and failed to immediately inform him of his *Miranda* rights.[7] The Government challenges Claimant's Motion to Suppress on a number of procedural grounds. The Government also argues that Claimant's Fourth Amendment rights were not violated because Claimant's consent to search his vehicle was voluntary, and because his subsequent detention—including the use of handcuffs during this detention—was not unreasonable.

### A. Relevant Law

■■■ The Fourth Amendment's exclusionary rule is applicable to civil forfeiture proceedings. *See One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 696, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965); *United States v. $404,905.00 in U.S. Currency,* 182 F.3d 643, 646 (8th Cir.1999). Accordingly, a claimant who has standing to contest the lawfulness of a seizure may seek to exclude any evidence seized in violation of the Fourth Amendment from use in a civil forfeiture action. *See* Fed.R.Civ.P. G(8)(a). Conversely, the Fifth Amendment's Self-Incrimination Clause is only applicable to civil forfeiture proceedings where the forfeiture statute makes the culpability of the owner relevant or where the owner faces the possibility of subsequent criminal proceedings. *United States*

*v. $141,770.00 in U.S. Currency,* 157 F.3d 600, 606 n. 5 (8th Cir.1998) (*citing Austin v. United States,* 509 U.S. 602, 608, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)). "In rem forfeitures under 21 U.S.C. § 881 are not predicated on the culpability of any defendant," and where there is no evidence that a claimant faces any criminal proceedings related to civil forfeiture, such cases are considered civil actions for the purpose of the Fifth Amendment. *Id.* (citing *United States v. Two Parcels of Real Prop. Located in Russell Cnty., Ala.,* 92 F.3d 1123, 1129 (11th Cir.1996)).

■■■ The Fourth Amendment guarantees "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "It is well settled under the Fourth and the Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (internal quotations and citations omitted). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* Additionally, law enforcement officials are not justified in handcuffing an individual unless they have probable cause for arrest or have reasonable suspicion to believe that the individual could be dangerous. *See El–Ghazzawy v. Berthiaume,* 636 F.3d 452, 460 (8th Cir. 2011) (slip copy) ("[A]ny reasonable officer

---

7. In his Motion to Suppress, Claimant argued that he was not provided with a *Miranda* warning until he was taken to the police station, and thus sought to exclude physical evidence seized from his vehicle and various statements made prior to being advised of his *Miranda* rights. *See* Suppression Br. at 11.

However, during the March 18, 2011 hearing, Claimant conceded that Officer Haas did, in fact, advise him of his *Miranda* rights shortly after the officers found the currency. By this admission, the Court assumes that Claimant no longer seeks to suppress statements made after this *Miranda* warning.

would understand that it is unconstitutional to handcuff someone absent probable cause or an articulable basis to suspect a threat to officer safety combined with reasonable suspicion.") (quoting *Manzanares v. Higdon*, 575 F.3d 1135, 1150 (10th Cir. 2009)).

 Courts "exclude the fruits of unreasonable searches on the theory that without a strong deterrent, the constraints of the Fourth Amendment might be too easily disregarded by law enforcement." *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 349, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006) (quoting *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)). However, the exclusionary rule is not a necessary consequence of a Fourth Amendment violation, but instead applies " 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.' " *Herring v. United States*, 555 U.S. 135, 129 S.Ct. 695, 702, 172 L.Ed.2d 496 (2009) (quoting *Illinois v. Krull*, 480 U.S. 340, 348–49, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987)). Additionally, to determine whether evidence should be excluded as "fruit of the poisonous tree," the appropriate inquiry is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Thus, "[i]f the evidence was not obtained by exploitation of the [initial illegallity], but rather by 'means sufficiently distinguishable to be purged of the primary taint,' then it should not be excluded." *See United States v. Greer*, 607 F.3d 559, 564 (8th Cir.2010) (quoting *Brown v. Illinois*, 422 U.S. 590, 599, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)); *see also* Fed. R.Civ.P. G(8)(a) ("Suppression does not affect forfeiture of the property based on independently derived evidence."). With these principles in mind, the Court now turns to each of Defendant's arguments for suppression.

### B. *Legal Analysis*

#### 1. *Was Claimant's consent voluntary?*

 Claimant admits he granted Officer Haas consent to search his vehicle. *See* Suppression Br. at 1. However, he argues that this consent was not voluntary because a number of factors combined to overcome his will. Specifically, Claimant points to his repeated statements referencing his desire to get back on the road, and the fact that Officer Haas responded to these statements by repeatedly asking him whether he could search Claimant's vehicle. Claimant also argues that Officer Haas' threat to call in a drug dog if Claimant did not consent to the search further contributed to the coercive atmosphere that rendered his consent involuntary.

 "Consent is voluntary if it is 'the product of an essentially free and unconstrained choice by its maker,' rather than the 'product of duress or coercion, express or implied.' " *United States v. Cisneros–Gutierrez*, 598 F.3d 997, 1003 (8th Cir.2010) (quoting *Bustamonte*, 412 U.S. at 222, 93 S.Ct. 2041). Whether consent is voluntary is "a question of fact to be determined by the totality of the circumstances." *Id.* In evaluating the environment in which consent was given, relevant factors include:

"(1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded

place; and (6) whether he stood by silently ... as the search occurred." *United States v. Esquivias,* 416 F.3d 696, 700 (8th Cir.2005) (quoting *United States v. Smith,* 260 F.3d 922, 924 (8th Cir.2001)). "The precise question is not whether [someone] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented." *United States v. Jones,* 254 F.3d 692, 695 (8th Cir.2001).

In this case, none of the relevant factors suggest that the environment was sufficiently coercive to render Claimant's consent involuntary. At the time Claimant consented, Officer Haas had already informed him that he was free to leave, and thus, he was not in police custody. *See United States v. White,* 81 F.3d 775, 778 (8th Cir.1996). There is no indication that Officer Haas physically threatened Claimant, or made any promises or misrepresentations to him. Neither do the other factors cited by Claimant indicate that his consent was involuntary. Claimant's statements that he was looking forward to getting back on the road indicate he may have been concerned about the prospect of a lengthy delay, but they do not negate the fact that immediately after making these statements, he clearly and affirmatively consented to a search of his vehicle. Additionally, a review of the recording shows that when Officer Haas asked Claimant a second time whether he could search the vehicle, it was not done in an attempt to overcome Claimant's will or ignore a previous denial, but instead was simply a confirmation that Claimant had consented to the search. *See* Recording at 8:52–53.

Finally, Claimant asserts that Officer Haas' "threat" to use a drug dog made his consent involuntary. Claimant relies on *United States v. Beck,* 140 F.3d 1129 (8th Cir.1998), to support this claim. However, both the legal issue and the relevant facts in *Beck* are distinguishable from this case.

The defendant in *Beck* refused to consent to a search of his vehicle. *Id.* at 1132. Thus, the legal issue in *Beck* was whether the officer had reasonable cause to extend the traffic stop when he summoned a drug dog, not whether the defendant's consent was voluntary. *Id.* at 1133. More importantly, Claimant's assertion that Officer Haas threatened to use a drug dog if he withheld his consent is unsupported by the record. Far from a threat, Officer Haas stated that, were Claimant to refuse to consent to the search, he would then "ask you (Claimant) to let me run a dog around the vehicle." Recording at 8:55–56. This response, in which Officer Haas clearly stated he would ask for Claimant's permission to use a drug dog, supports the conclusion that this was a voluntary interaction as opposed to one where Claimant was coerced or threatened into giving his consent. There is simply no support, in either the record or the law, for Claimant's contention that the specter of an impending question is sufficient to render his consent involuntary.

### 2. *Was Claimant illegally detained?*

■ Claimant also argues that he was illegally detained when officers, after finding an unidentified pill in his vehicle, handcuffed him while he was in Officer Haas' police car. He claims that the use of handcuffs was not necessary in light of the fact that Officer Haas had already conducted a protective pat-down search and determined that Claimant did not possess any weapons. Thus, Claimant argues, the use of handcuffs amounted to an unauthorized arrest for which the Court should suppress the evidence later discovered in Claimant's vehicle.

As an initial matter, Claimant misinterprets the scope of the exclusionary rule, which only serves to exclude evidence which is discovered "by exploitation of [a

constitutional] illegality." *Wong Sun,* 371 U.S. at 488, 83 S.Ct. 407. Here, even assuming that the officer's use of handcuffs amounted to an illegal arrest, the evidence Claimant seeks to suppress was not discovered by the exploitation of this arrest. Instead the evidence was discovered by a search of the vehicle, which was founded first upon the independent legal justifications of consent and then (once the officers found the unidentified pill) on probable cause. *See United States v. Hambrick,* 630 F.3d 742, 747 (8th Cir.2011) ("Under the automobile exception, if a law enforcement officer has probable cause, he may search an automobile without a warrant.") (quoting *United States v. Rodriguez,* 414 F.3d 837, 843 (8th Cir.2005)).

 Moreover, the officer's use of handcuffs in this case did not amount to an illegal arrest of Claimant. Here, Claimant challenges Officer Haas' stated rationale for using handcuffs—officer safety—claiming it was not based on a reasonable belief that Claimant posed a danger to the officers or himself.[8] However, this overlooks the fact that the use of handcuffs was justified in this case because there was probable cause to arrest Claimant. When the officers handcuffed Claimant, they had found an unidentified pill in an unmarked prescription pill bottle that they suspected was ecstasy. When confronted with the pill, Claimant immediately stated that the pill was Suboxone, and admitted that he did not have a prescription for it.[9] *See*

Recording at 9:04. Based on these facts, at the very least officers had probable cause to suspect that Claimant was in unauthorized possession of a prescription medication, if not ecstasy. Accordingly, whether or not the use of handcuffs turned a consensual encounter into an arrest is irrelevant, because even if it did, the arrest was based on probable cause.

3. *Alleged* Miranda *violations.*

 Claimant also argues that the evidence found in his vehicle should be suppressed because officers failed to administer a *Miranda* warning when they handcuffed him. This argument fails for two reasons. First, the failure to give a suspect *Miranda* warnings does not require the suppression of the physical fruits of the suspect's unwarned but voluntary statements. *See United States v. Patane,* 542 U.S. 630, 638, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) ("The [Self–Incrimination] Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements."). Thus, ignoring for the moment that there is no apparent connection between the evidence in question and the alleged *Miranda* violation, a *Miranda* violation is not grounds upon which physical evidence is properly excluded in the first place. But even more importantly, civil forfeitures conducted pursuant to 21 U.S.C. § 881 are considered civil cases for

---

8. Officer Haas stated that, given his experience with individuals suspected of involvement with drug activity, in the interest of officer and Claimant's safety, he felt it was necessary to handcuff Claimant. *See* Supp. Resp. to Mot. to Suppress, Ex. 1 at 5–6. The Court finds no reason to examine this claim in light of its determination that there was probable cause to arrest Claimant.

9. These statement were made prior to any *Miranda* warnings, and for this reason would likely be inadmissible during a criminal trial.

However, this does not prevent the use of these statements in determining whether there was probable cause to arrest. *See United States v. Aragon–Ruiz,* 551 F.Supp.2d 904, 913–14 (D.Minn.2008) ("[I]n the absence of 'trickery or coercion, there is no justification for requiring a police officer to ignore incriminating admissions in arriving at a conclusion that there is probable cause for an arrest.'") (quoting *United States v. Morales,* 788 F.2d 883, 886 (2d Cir.1986)); *see also United States v. Gallardo,* 58 F.Supp.2d 1018 (S.D.Iowa 1999) (same).

the purpose of the Fifth Amendment's Self–Incrimination Clause. *See* $141,770.00 *in U.S. Currency*, 157 F.3d at 606 n. 5. Accordingly, *Miranda's* prophylactic protection of the Fifth Amendment's Self Incrimination Clause does not extend to this type of civil proceeding. *See Baxter v. Palmigiano*, 425 U.S. 308, 315, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("The Court has never held, and we decline to do so now, that the requirements of [*Miranda*] must be met to render pretrial statements admissible in other than criminal cases.").

### III. MOTION FOR SUMMARY JUDGMENT

#### A. *Standard for Summary Judgment*

The term "summary judgment" is something of a misnomer.[10] *See* D. Brock Hornby, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive. *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitu-

tional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[11] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

■■■ Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim ... on which summary judgment is sought."[12] "Summary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir.1998). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert John-*

---

**10.** Judge D. Brock Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." Hornby, D. Brock, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273, 284 (Spring 2010).

**11.** Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other

things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

**12.** Rule 56 was revised shortly before the instant motion was filed and all citations to Rule 56 in this Order refer to the current version. However, the revised rule does not change the substantive standard for summary judgment. *See* Fed.R.Civ.P. 56 advisory committee's note ("Rule 56 is revised to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged."). Therefore, the Court will continue to rely upon pre–2010 case law regarding the substantive standards governing summary judgment.

*son Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Bd. of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)).

Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine dispute of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y.1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must cite specific facts, supported by admissible evidence, showing that there remains a genuine dispute of material fact that needs to be resolved by a trial. *See Commercial Union Ins. Co. v. Schmidt,* 967 F.2d 270, 271 (8th Cir.1992); *see also* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *See* Fed.R.Civ.P. 56(c)(1)(A); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th

Cir.1994). In a motion for summary judgment, the job of a court is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 *and* 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed. 1998)). It is the responsibility of the parties to provide the evidence necessary for this assessment. *Id.* at 921.

### B. *Relevant Law*

█ Any money furnished, or intended to be furnished in exchange for a controlled substance is subject to forfeiture by the United States. *See* 21 U.S.C. § 881(a)(6). "Forfeiture is warranted under 21 U.S.C. § 881 when the government establishes a 'substantial connection between the property' and a controlled substance offense." *United States v. $124,700 in U.S. Currency,* 458 F.3d 822, 825 (8th Cir.2006) (quoting 18 U.S.C. § 983(c)(3)). The Government bears the burden of establishing by a preponderance of the evidence that property is subject to forfeiture. *See id.;* § 983(c)(1). This burden can be met through the use of direct or circumstantial evidence. *See United States v. $84,615 in U.S. Currency,* 379 F.3d 496, 501 (8th Cir.2004); *United States v. $159,880.00 in U.S. Currency, More or Less,* 387 F.Supp.2d 1000, 1012 (S.D.Iowa 2005). Consequently, the Government need not trace the property to a particular drug transaction. *See United States v. Eighty–Seven Thousand Sixty Dollars,* 23 F.3d 1352, 1354 (8th Cir.1994). "If the government meets its burden of proof, it will prevail on its motion for summary judgment, unless the claimants introduce evidence sufficient to support their case." *$159,880 in U.S. Currency, More or Less,* 387 F.Supp.2d at 1012 (citing *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars,* 403 F.3d 448, 463 (7th Cir.2005)); *see also United States v. Real Prop. Located at 3234 Washington Ave.,* 480 F.3d 841, 843 (8th Cir.2007).

### C. *Analysis*

█ The Government claims it is entitled to summary judgment because there are no genuine disputes of material fact, and when the undisputed evidence is viewed as a whole, it proves by a preponderance of the evidence that the defendant currency is subject to forfeiture. The Government specifically claims that the following facts establish the necessary "substantial connection" between the defendant currency and a controlled substance offense: 1) the amount and denominations of the currency; 2) Claimant's inability to provide a legitimate source for the currency; 3) the manner in which the currency was transported; 4) the inconsistent statements that Claimant made to law enforcement; and 5) the alerts by a drug dog to the currency and snowboard bags.[13] The Government con-

---

13. The Government also argues that Claimant's history of drug use and his previous drug conviction, as well as Claimant's travel between locations involved in drug trafficking, support the connection between the currency and drug trafficking. Regarding Claimant's history with drugs, the Government specifically points to a ten-year old conviction for distribution of marijuana, and his admitted heroin use. *See* Gov't App. 4, 38. However, the Court has not considered Claimant's history of drug use, as it is mind-

ful that summary judgment must be supported with admissible evidence, *see* Fed. R.Civ.P. 56(c)(2), and the Court has concerns regarding the admissibility of Claimant's prior involvement with drugs. The Court has also declined to consider the allegation that Defendant's travel was between locations known to be involved in drug trafficking because the Government has failed to properly support this allegation with evidence that Cal-

cludes that, particularly when viewed in its totality, the evidence establishes a substantial connection between the currency and a controlled substance offense.

Claimant counters that there are genuine disputes of material fact that preclude summary judgment. *See* Claimant's Facts ¶ 14; Br. in Resistance to Summ. J. (Clerk's No. 11.3) at 14. Claimant also disputes the significance of the facts presented by the Government, ultimately concluding that "the United States has not met its burden to show by a preponderance of the evidence that the subject currency is substantially related to drug activity." [14] *Id.* The Court will address these arguments in turn.

### 1. *Is there a genuine dispute of material fact?*

Claimant asserts that there are two genuine disputes of material fact that should prevent summary judgment. First, Claimant denies that only $6,020 of the defendant currency is comprised of bills that pre-date 1998. *See* Resp. to Gov't Facts (Clerk's No. 11.1) ¶ 4. Second, Claimant disputes that the drug dog alerted to the scent of narcotics on the five snowboard bags found in his vehicle. *Id.* ¶ 2. "To defeat a motion for summary judgment, a

party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Cook v. City of Bella Villa,* 582 F.3d 840, 848 (8th Cir.2009) (citing *Davenport v. Univ. of Ark. Bd. of Trustees,* 553 F.3d 1110, 1113 (8th Cir. 2009)). "A genuine issue of fact exists 'if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case.' " *Paine v. Jefferson Nat. Life Ins. Co.,* 594 F.3d 989, 992 (8th Cir.2010) (citing *Rakes v. Life Investors Ins. Co. of Am.,* 582 F.3d 886, 893 (8th Cir.2009)).

Here, the Government has presented evidence, in the form of Officer West's affidavit, that only $6,020 worth of the defendant currency consisted of bills dated prior to 1998. Gov't Facts ¶ 11; Gov't App. at 41. Claimant disputes the Government's account, stating "the government destroyed the evidence by transferring it to a cashier's check. We were provided with photos but are unable to discern dates." Resp. to Gov't Facts ¶ 4. However, the only evidence that Claimant has presented on this issue are his repeated admissions that he used portions of his Father's Money, and then replenished the portions that he used with other funds. *See* Br. in

---

ifornia and Maryland are known drug trafficking locations.

**14.** Claimant also asserts an "innocent owner" defense. *See id.* Section 983(d)(2)(A) defines an innocent owner as an owner who "did not know of the conduct giving rise to forfeiture; or upon learning of the conduct giving rise to forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." As such, it is an acknowledgment that despite the substantial connection between property and illegal activity, a wholly innocent party should not be deprived of their legitimate property interest. *See Real Prop.*

*Located at 3234 Washington Ave.,* 480 F.3d at 843 (stating that "innocent owner defense" is an affirmative defense). While Claimant labels his argument as an "innocent owner" defense, it actually addresses whether the undisputed facts prove a substantial connection between the defendant property and a controlled substance offense. Accordingly, the Court will consider these arguments in determining whether the Government has met its burden on summary judgment as opposed to whether or not the Claimant is an "innocent owner" as that term is defined in § 983(d)(2)(A).

Resistance to Summ. J. at 13, 15; Def.'s App. at 23. This evidence is consistent with the fact that Claimant is attempting to dispute. While the Court concedes that there is no way to definitively establish the amount of currency comprised of bills predating 1998 because the Government converted the funds to a cashier's check, this does not completely absolve Claimant from presenting evidence on this point. To defeat summary judgment, Claimant has the burden of providing some sort of evidence upon which a jury could rule in his favor. *See Paine*, 594 F.3d at 992. As it stands, the only evidence a jury would have to consider would be Officer West's testimony that only $6,020 of the currency consisted of bills dated prior to 1998, and Claimant's testimony—which would be completely consistent with Officer West's testimony— that he used portions of his Father's Money and then later replaced it. To create a genuine dispute, at the very least Claimant could have presented an affidavit stating that he did not spend as much of his Father's Money as the Government is claiming. However, given his failure to offer any sort of evidence to this effect, a reasonable jury could not find for him on this point, and thus he has not demonstrated that there is a genuine factual dispute.

Claimant also disputes that a drug dog alerted on the snowboard bags found in his vehicle. The Government's evidence on this point comes from Officer Clyde's affidavit. Officer Clyde states that on April 9, 2009, a drug dog named "Jack" alerted to the scent of narcotics on the snowboard bags. *See* Gov't App. at 43. Claimant disputes this claim by citing to the April 9, 2009 drug dog usage report, also completed by Officer Clyde. *See* Br. in Resistance to Summ. J. at 13; Claimant's App. at 30–31. The usage report indicates that Officer Clyde used Jack to test for the presence of narcotics on the defendant currency, but makes no mention of the snowboard bags. *See* Claimant App. 30–31. Claimant further argues that, had a drug dog actually alerted on the bags, they would not have been returned to him. *See* Claimant App. at 12.

Again, the Court finds that Claimant has not presented sufficient evidence to create a genuine dispute of fact. While the absence of any notation in the usage report about Claimant's snowboard bags does raise questions about the reliability of both Officer Clyde's affidavit and the usage report, mere attacks on the credibility or reliability of evidence is not enough to create a genuine factual dispute. *See Clark v. Principi*, 200 F.Supp.2d 1109, 1125–26 (E.D.Mo.2002) ("Furthermore, attacking the credibility of certain witnesses ... does not create a genuine issue of material fact ... the opponent must affirmatively show that a material issue of fact remains in dispute and may not simply rest on the hope of discrediting the movant's evidence at trial.") (quoting *Barge v. Anheuser–Busch, Inc.*, 87 F.3d 256, 260 (8th Cir.1996)). At most, Claimant has shown that Officer Clyde failed to document the event in the usage report. However, Claimant has presented no evidence that the usage report was a complete record of Jack's activity for April 9, 2009. Nor has he shown that it is a violation of department protocol—or even uncommon—that an officer not document a drug dog's use or alert on a particular piece of evidence in a usage report. While at this stage the Court must draw all reasonable inferences in favor of the Claimant, Claimant would have the Court infer something that directly conflicts with Officer Clyde's affidavit—the only evidence presented by either side that directly addresses whether a drug dog was used on the snowboard

bags. Thus, the Court finds that this is not a mere inference, but instead a fact that Claimant was required to support with actual evidence if he wished to demonstrate that there is a genuine dispute.[15]

Similarly, Claimant has offered no evidence suggesting that it would be unusual or uncommon to return an individual's property after a drug dog alerted to the scent of narcotics on the property. Again, without some actual evidence, whether it be a department policy or statements from officers about standard evidentiary procedures, the Court finds that Claimant has not provided sufficient support for his allegations, and thus has not demonstrated that there is a genuine dispute of fact.

 2. *Does the undisputed evidence establish a substantial connection between the currency and a controlled substance offense ?*

The Government argues that the undisputed facts, when viewed in their totality, create a substantial connection between the seized currency and a controlled substance offense. Claimant disputes the significance of these facts individually, as well as the Government's ultimate conclusion that together they are sufficient to create a substantial connection to drug trafficking. The Court will examine the significance of the Government's facts individually. However, the Court is mindful that it is to view the evidence "as a whole." *$124,700 in U.S. Currency,* 458 F.3d at 826.

 a. *The amount and denomination of the currency.*

The Government argues that the amount of currency and the denominations of the

bills are evidence of a substantial connection to a controlled substance offense. Specifically, the Government claims that $107,000 is an unusually large amount of currency for anyone to be transporting cross-country. The Government further points out that over eighty percent of the currency was comprised of either $20, $10 or $5 bills. *See* Gov't Facts ¶ 8. Claimant counters that the mere possession or use of currency does not create a substantial connection to drug trafficking, and that there is nothing illegal about his choice to not use a financial institution to store his money.

 ■ Claimant is correct that mere possession or use of cash, as opposed to other forms of currency does not create a "substantial connection" to drug activity. *See United States v. $321,590.00 in U.S. Currency,* No. 8:08CV193, 2009 WL 1740596, at \*13 (D.Neb. June 15, 2009) (slip copy). Indeed, it seems likely that "any amount of money, standing alone, would probably be insufficient to establish probable cause for forfeiture." *$141,770.00 in U.S. Currency,* 157 F.3d at 603 (quoting *United States v. $191,910.00, in U.S. Currency,* 16 F.3d 1051, 1072 (9th Cir.1994), superseded by statute on other grounds as recognized in *United States v. $80,180.00 in U.S. Currency,* 303 F.3d 1182, 1184 (9th Cir.2002)). However, while a large amount of currency may not alone be sufficient to warrant seizure, the Eighth Circuit has consistently held that "possession of a large amount of cash is 'strong evidence' that the cash is connected with drug activity." *$124,700 in U.S. Currency,* 458 F.3d at 826 (citing

---

**15.** The Court further notes that Claimant has not alleged, pursuant to Federal Rule of Civil Procedure 56(d), that facts necessary to justify his opposition were unavailable to him. Thus, the Court assumes that Claimant could have produced these facts by deposing Officer Clyde, or any other officer with knowledge of the practices and procedures used in documenting the use of drug dogs.

*$84,615 in U.S. Currency,* 379 F.3d at 501–02). Similarly, when large amounts of currency are comprised mainly of small denominations, this creates a further association with criminal activity. *See United States. v. $6,360 in U.S. Currency,* No. 8:07CV492, 2009 WL 2824778, at *4 (D.Neb. Aug. 23, 2009) (currency subject to forfeiture was mostly in denominations of $10 and $20 bills); *United States v. Approximately $28,000 in U.S. Currency,* No. 09–5377, 2010 WL 1340110, at *3 (N.D.Cal. Apr. 5, 2010) (finding large amounts of currency in small denominations consistent with criminal activity). Thus, in accord with Eighth Circuit precedent, the Court finds that Claimant's possession of over $107,000 in currency, comprised primarily of $5, $10 and $20 bills, is strong evidence of a substantial connection to drug trafficking.

### b. *Source of the currency.*

The Government next argues that Claimant has failed to provide sufficient evidence of a legitimate source for the currency. The absence of an apparent, verifiable source for a large sum of currency supports a claim of forfeiture. *See United States v. U.S. Currency, in Amount of $150,660.00,* 980 F.2d 1200, 1207 (8th Cir.1992); *Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars,* 403 F.3d at 466 ("[T]he court properly could draw inferences and grant summary judgment on the basis of the substantial and documented differences between the sources of income properly accounted for [by the claimant] and his claimed sources of income (which he failed to substantiate)"); *United States v. $174,206.00 in U.S. Currency,* 320 F.3d 658, 662 (6th Cir.2003) ("[E]vidence of legitimate income that is insufficient to explain the large amount of property seized,

unrebutted by any evidence pointing to any other source of legitimate income … satisfies the burden imposed by the statute.").

Claimant counters that he has presented evidence, in the form of his own affidavits, detailing the legitimate sources from which he acquired the defendant currency. Specifically, Claimant states that slightly more than half is his Father's Money. He states that the remainder of the currency is money that he saved over the past ten years. Claimant provides the following sources for these savings: $10,000 in life insurance he received when his father died, $10,000–$20,000 in profits from fixing and selling cars, $40,000 from a bank loan, an unidentified sum from renting out rooms in the house he inherited from his father, and wages he earned from various employers. *See* Claimant's App. at 20, 22, and 26.

As an initial matter, it is not clear that the evidence presented by Claimant—affidavits with no documentary support—satisfies his burden on summary judgment. *See Frevert v. Ford Motor Co.,* 614 F.3d 466, 473 (8th Cir.2010) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits." (internal citations omitted)). However, even accepting Claimant's undocumented statements regarding the sources of the currency, when viewed in conjunction with the other evidence in the case, these sources do not sufficiently explain how Claimant acquired the defendant currency.

Claimant states that approximately $62,000 of the currency was his Father's Money, which he found either buried or hidden on the property that he inherited. Notably, Claimant explains that this father stopped burying money in 1998. *See* Gov't App. at 41. However, only $6,020 of the defendant currency consists of bills dated

prior to 1998. *See* Gov't Facts ¶ 11. Claimant explains this discrepancy by noting that once he uncovered the currency, he would use it from time to time, replacing the portions that he used with newer currency. *See* Claimant's App. at 23. However, because new funds from a separate source would have necessarily been used to replace the portions of his Father's Money that he spent, only $6,020 of the defendant currency could possibly have come from his Father's Money. This leaves over $100,000 of the defendant currency that must have come from other sources.

Claimant also explains that he received $40,000 from a bank loan. However, the Government has presented evidence that at most, $26,000 of this loan was distributed to Claimant. *See* Gov't App. at 41.[16] Second, Claimant states that portions of the currency came from various jobs he has worked over the past ten years. While Claimant has provided no evidence of the actual amount of income he received from these jobs, the Government has presented Claimant's tax records, which establish that over the past ten years he earned a *total* of $58,553. *See* Br. in Supp. of Summ. J. at 12; Gov't Facts ¶¶ 13–15. In a similar fashion, Claimant states that he earned money by renting out the home he inherited from his father, but he has provided no evidence regarding the amount of income he earned form this source. Finally, Claimant states that he acquired approximately $10,000 from a life insurance policy, and an additional $10,000 and $20,000 from fixing and selling used cars. *See* Claimant's App. at 19–22.

Simply put, the sources Claimant presents are not sufficient to explain the amount of currency found in his vehicle. While these sources total approximately $120,000, the Court would have to assume that Claimant lived essentially expense free over the past ten years in order to conclude that these sources were sufficient to account for the defendant currency. The Court does not find this assumption supported by either reason or the record. *See United States v. $4,629.00 in U.S. Currency,* 359 F.Supp.2d 504, 510 (W.D.Va. 2005) ("It seems highly unlikely that [claimant] would still retain the majority of the funds earned … without having expended those funds for the expenses of daily living"); Gov't App. at 15–16 (stating Claimant was paying $600 a month in rent over the past year and a half), 17 (stating that Claimant had paid $200–$300 in rent per month over various winter seasons while working at ski resorts), 22 (stating that Claimant was making monthly payments on his loan of $484), 37 (stating Claimant was a recently recovering heroin addict). When these expenses along with general living expenses are accounted for, it is not plausible to conclude that Claimant was able to acquire the defendant currency solely from the sources of income he has presented to the Court.

c. *The manner in which the currency was transported.*

The Government next argues that Claimant's attempts to conceal the currency, and the fact that it was heat-wrapped in plastic, are further evidence of the substantial connection between the currency and drug trafficking. Claimant counters that these facts are not evidence of a connection to drug trafficking because he has

---

16. There is also evidence that Claimant was making payments of $484 a month on this loan, although no information has been provided regarding how many of these payments he actually made. *See* Gov't App. at 22.

legitimate explanations for both of them. Specifically, Claimant argues that it is not unusual to conceal a large amount of currency when traveling. Br. in Resistance to Summ. J. at 12. He also argues that he wrapped the money in plastic because the money smelled bad and because he wanted to prevent it from rotting. *See* Gov't App. at 41, 28.

■■■ Attempting to conceal currency from law enforcement is evidence of a substantial connection between the currency and drug trafficking. *$159,880.00 in U.S. Currency, More or Less,* 387 F.Supp.2d at 1013 (citing *$84,615 in U.S. Currency,* 379 F.3d at 502). Concealing currency can consist of both hiding the currency within a vehicle, and not disclosing its location to police officers. *Id.* Additionally, packaging money in plastic wrapping is evidence of drug trafficking, as this is a "common ploy to mask odors such as might be detected by dog searches." *$84,615 in U.S. Currency,* 379 F.3d at 502; *see also United States v. $117,920.00 in U.S. Currency,* 413 F.3d 826, 829 (8th Cir. 2005).

Here, Claimant initially concealed the currency behind a velcro liner in his suitcase. While he claims that this type of behavior is not uncommon, the Eighth Circuit has instead adopted the "common-sense view that bundling and concealment of large amounts of currency ... supports a connection between money and drug trafficking." *$124,700 in U.S. Currency,* 458 F.3d at 826 (citing *$117,920.00 in U.S. Currency,* 413 F.3d at 829). Additionally, Claimant attempted to conceal the currency when he told Officer Haas that he did not have any large sums of currency in his vehicle. While Claimant has provided no explanation to the Court for this attempted deception, when Officer Haas asked him

why he did not disclose the currency Claimant responded, "I honestly did not know if that was legal." Recording at 9:39–40. He also whispered to himself, immediately before the officers found the currency, "[O]h no. Please God, please God, please God please." *Id.* at 9:25. The Court finds these statements further support the Government's contention that he was concealing the currency because it was substantially involved in drug trafficking.

Similarly, Claimant's explanation for why he had packaged the currency in heat-sealed plastic is contradicted by the record. He initially claimed that he wrapped the money in heat-sealed plastic because, due to the amount of time that the currency had been buried in his father's backyard, it had an unpleasant odor. *See* Gov't App. at 41. He later explained that he wrapped the currency in plastic to prevent it from rotting. *See id.* at 28. However, as already discussed, only $6,020 of the currency consisted of bills that pre-dated 1998, meaning that the vast majority of the currency consisted of bills that had never been buried. Furthermore, Claimant unearthed his Father's Money in 1999, meaning it had been sitting in an open air environment for approximately ten years before he began his cross-country journey. *See* Claimant's App. at 23 (stating that the money was placed under an internal staircase). Thus, his explanations for heat-wrapping the currency in plastic are contradicted by his own statements about the composition and storage of the currency. Accordingly, the Court finds that the manner in which the currency was transported, including Claimant's attempts to conceal it and the fact that it was heat-wrapped in plastic, supports the conclusion that there is a substantial connection between the currency and drug trafficking.

d. *Claimant's inconsistent statements.*

■■■ The Government argues that Claimant's inconsistent statements regard-

ing his travel between California and Maryland are further evidence of the substantial connection between the defendant currency and drug trafficking. "[I]nconsistencies and contradictions are relevant in determining whether the government has met its burden in justifying forfeiture." *$159,880.00 in U.S. Currency, More or Less,* 387 F.Supp.2d at 1015; *see also $141,770.00 in U.S. Currency,* 157 F.3d at 604 (8th Cir.1998) (finding that Claimant's inconsistent statements supported forfeiture). Claimant offers no legal authority to dispute this contention. Instead, he argues that he made these inconsistent statements because he was flustered after being taken into police custody.

During the traffic stop, Claimant initially told Officer Haas that he had flown to Maryland from California, and was in the process of driving back to California. *See* Gov't Facts ¶ 11. However, when Officer Haas informed Claimant that he would check the airline records, Claimant changed his account, stating that he had actually driven from California to Maryland. *See* Recording at 9:39. Later that day, during an interview with Officer West, Claimant again stated that he had driven from California to Maryland, and that the drive had taken approximately five days. *See* Gov't Facts ¶ 5. Then, during his deposition, Claimant reverted to his initial account, and stated that he had flown from California to Maryland, and decided to drive back in a rented vehicle because he wanted to bring a four-wheeled recreational vehicle back with him to California. *See id.* ¶ 6.

As noted, Claimant explains that he made these inconsistent statements because he was nervous and flustered after being taken into custody. While the Court has no record of his behavior during his interview with Officer West, a review of the Recording contradicts this claim. From the time that Claimant consented to the search of his vehicle until he arrived at the police station, the Recording shows that Claimant maintained a calm demeanor, and that he was able to carry on a clear and articulate conversation with Officer Haas. *See, e.g.,* Recording at 9:35–36 (Claimant explaining medical process by which Suboxone worked). In fact, Claimant explained to Officer Haas that he originally lied about flying from California to Maryland because he was worried that it would look suspicious that he drove. *Id.* at 9:40. The fact that he was able to recognize that he had made inconsistent statements about his travel from California to Maryland and provide a plausible explanation for why he made these statements further contradicts his claim that he was so flustered that he could not accurately explain how he had traveled from California to Maryland.

In any event, even assuming that Claimant was flustered after being taken into custody, that alone cannot account for the inconsistent statements he made to law enforcement officials. The fact at issue—the manner in which he traveled across the width of the country—is not a minor detail that nervousness or excitement could cause someone to confuse or forget. Indeed, by Claimant's own admission, it was a journey that took him five days to make. *See* Gov't Facts ¶ 5. The Court finds it unreasonable to attribute such inconsistencies to mere nervousness, and instead finds that these inconsistencies provide further support for forfeiture.

e. *Drug dog's alert to the currency and snowboard bags.*

The Government asserts that the drug dog's alert to the scent of narcotics on the

defendant currency and the snowboard bags is further evidence of a substantial connection to drug trafficking. Defendant counters that, given an "extremely high percentage of all cash in circulation in America today is contaminated with drug-residue .... [t]he fact of contamination, alone, is virtually meaningless and gives no hint of when or how the cash became so contaminated." *Muhammed v. Drug Enforcement Agency, Asset Forfeiture Unit,* 92 F.3d 648, 654 (8th Cir.1996) (citing *United States v. $5,000,* 40 F.3d 846, 848–50 (6th Cir.1994)).

Courts differ on how much weight—if any—to afford a drug dog's alert to currency. In addition to *Muhammed,* Claimant cites cases from the Seventh and Ninth Circuits to support his contention that the Court should afford no weight to a drug dog's alert to currency. *See United States v. $506,231 in U.S. Currency,* 125 F.3d 442, 453 (7th Cir.1997); *United States v. U.S. Currency, $30,060.00,* 39 F.3d 1039, 1042 (9th Cir.1994). However, since *Muhammed,* the Eighth Circuit has determined that a drug dog's alert to currency provides "slight" support that a link exists between currency and drug trafficking. *See $124,700 in U.S. Currency,* 458 F.3d at 826 n. 1 (affirming the Eighth Circuit precedent of giving "slight" value to a canine alert to currency, as established in *$84,615 in U.S. Currency,* 379 F.3d at 502, and stating that the issue "is largely a scientific question, and absent a developed record, we decline to expand on our previous pronouncements in this area"); *see also $117,920 in U.S. Currency,* 413 F.3d at 829. Thus, consistent with the more recent Eighth Circuit precedent, the Court concludes that the drug dog's alert to the defendant currency does provide some—albeit slight—support for the Government's contention that the currency is substantially connected to drug trafficking.

While there are reasons to question the significance of the drug dog's alert on the currency, the Court has no such reservations regarding the drug dog's alert to the snowboard bags. Unlike currency, the Court is unaware of—and Claimant has failed to present—any evidence of widespread contamination of snowboard bags with narcotic residue. Absent such evidence, the Court finds the drug dog's alert on the snowboard bags to be additional evidence that the defendant currency is substantially connected to drug trafficking.

*f. Totality of the evidence supports forfeiture.*

The Court recognizes that summary judgment in favor of the party with the burden of proof is rare. *See Turner,* 149 F.3d at 824. However, based on the factual record before it, the Court finds that it is appropriate in this case. Here the Government has shown that Claimant was traveling across the country with over $107,000.00 in United States currency, which consisted of mainly $5, $10 and $20 bills. The Currency was heat-wrapped in plastic, and hidden behind a false lining in a suitcase. Claimant attempted to conceal the currency from law enforcement, and made numerous inconsistent statements about how he had traveled from California to Maryland. Further, a drug dog alerted to the scent of narcotics on both the currency, and on five empty snowboard bags that Claimant had in his vehicle. Finally, Claimant has been unable to provide evidence of a legitimate source for the currency. This satisfies the Government's burden of showing by a preponderance of the evidence that there is a substantial connection between the currency and a controlled substance offense. *See $124,700 in U.S. Currency,* 458 F.3d at 826 (finding a substantial connection to drug trafficking

when claimant had a large amount of concealed currency, a strange travel pattern, made false statements to law enforcement officers, and a drug dog alerted on the currency); *$117,920.00 in U.S. Currency,* 413 F.3d at 829 (finding a substantial connection to drug trafficking when claimant possessed a large sum of currency which was concealed and wrapped in plastic, a drug dog alerted to the currency, claimant lied to officers about having the money, and he possessed a digital scale). Thus, the Government is entitled to summary judgment as a matter of law.

## IV. CONCLUSION

For the reasons stated herein, Claimant's Motion to Suppress (Clerk's No. 16) is DENIED, and the Government's Motion for Summary Judgment (Clerk's No. 9) is GRANTED. IT IS SO ORDERED.