FILED

12/20/2016

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 2, 2016

IN RE LYNX C.

Appeal from the Juvenile Court for Knox County
No. 62197    Timothy E. Irwin, Judge

_____

No. E2016-01568-COA-R3-PT

_____

This appeal involves the termination of a mother's parental rights. The Tennessee Department of Children's Services ("DCS") removed the child at issue from the mother's home prior to his first birthday. Four months later, DCS filed a petition to terminate the mother's parental rights. The juvenile court found clear and convincing evidence of two grounds for termination and that termination of the mother's parental rights was in the child's best interest. We, however, conclude that DCS did not prove by clear and convincing evidence that the mother abandoned the child by willful failure to support. Because the record contains clear and convincing evidence of the remaining ground—abandonment by willful failure to visit—and that termination was in the best interest of the child, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and BRANDON O. GIBSON, JJ., joined.

Mary L. Ward, Knoxville, Tennessee, for the appellant, Chivas K.

Herbert H. Slatery III, Attorney General and Reporter, and M. Cameron Himes, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

I. FACTUAL AND PROCEDURAL BACKGROUND

Chivas K. ("Mother") and Jonathan C. ("Father") are the biological parents of Lynx C., born in November 2014. At birth, Lynx was diagnosed with Neonatal

Abstinence Syndrome, a medical condition caused by exposure to addictive opiate drugs while in utero. Lynx spent 28 days in the neonatal intensive care unit while being treated for withdrawal symptoms. Because Mother had complied with a Suboxone[1] program during her pregnancy, Lynx left the hospital in Mother's care.

Due to his condition, multiple follow-up appointments with a pediatrician were scheduled for Lynx; however, Mother did not keep the appointments. By October 2015, DCS received word that Lynx had missed four scheduled appointments with his pediatrician without explanation and that Mother had cancelled ten additional appointments. Following the report, DCS investigators attempted, unsuccessfully, to contact Mother and Lynx. As a result, DCS petitioned the Juvenile Court of Knox County, Tennessee for an ex parte order allowing DCS to enter Mother's home and conduct an investigation into the child's circumstances.

The court granted the ex parte protective order finding probable cause to believe Lynx was dependent and neglected due to medical neglect. DCS then removed the child from Mother's home on November 10, 2015, just before his first birthday. Mother was given a copy of the protective order and notice of the preliminary hearing two days later. That same day, DCS filed a petition in the Juvenile Court of Knox County, Tennessee to declare the child dependent and neglected and for emergency temporary legal custody. Both Mother and Father failed to appear at the preliminary hearing on the matter. On January 26, 2016, the juvenile court heard the petition, and on March 4, 2016, the court issued a final order adjudicating Lynx dependent and neglected.

On March 21, 2016, DCS filed a petition to terminate Mother's parental rights to Lynx.[2] DCS alleged three grounds for termination, including abandonment by willful failure to support, by willful failure to visit, and by failure to provide a suitable home. The juvenile court held a hearing on the petition on July 26, 2016. Mother, Father, the DCS caseworker assigned to Lynx's case, and the child's foster parent testified.

The DCS caseworker testified that, following the child's removal, she attempted to locate Mother for months to no avail. Despite DCS efforts, Mother did not contact the caseworker until February 17, 2016, over three months after Lynx was removed from her home. That day, Mother left the caseworker a voice message asking to set up a visit with Lynx, but when the caseworker attempted to return Mother's call, she could not be reached.

---

[1] "Suboxone is often prescribed to assist an individual in overcoming drug addiction." *United States v. $107,840.00 in U.S. Currency*, 784 F. Supp. 2d 1109, 1113 n.2 (S.D. Iowa 2011).

[2] DCS filed a separate petition to terminate Father's parental rights. Though the hearings were consolidated, Father's rights were terminated in a separate order by the juvenile court.

The caseworker testified that she attempted to contact mother at least three or four times without response in the days following Mother's call. Two weeks later, on March 3, 2016, Mother contacted DCS for the second time. Mother spoke with the caseworker and asked for guidance on regaining custody. The DCS caseworker testified that she reminded Mother of the responsibilities in the permanency plan by phone and provided her contact information to obtain an alcohol and drug assessment. Mother assured the caseworker that she would call back the following Monday to set up a meeting with DCS, but according to the caseworker, Mother made no further contact with DCS until March 29, 2016, after she was served with the petition to terminate her parental rights.

The DCS caseworker further testified that Mother failed to attend a scheduled appointment with DCS in April 2016, after which DCS was again unable to locate Mother for a time. On May 2, 2016, Mother showed up unexpectedly at DCS's offices to speak with the caseworker. Mother indicated that she had received the caseworker's messages and that she was still living in the same apartment in Knoxville, Tennessee where she had resided since Lynx's removal. According to the caseworker, Mother visited her child for the first time on July 1, 2016. She was permitted two additional visits before the hearing on the petition.

Mother also offered testimony concerning her failure to keep in contact with DCS. She testified that she did not attempt to contact DCS before February 2016 because she had relapsed on opiates after Lynx's removal from her home. She explained that she was afraid for DCS to learn of her relapse. Prior to the present case involving Lynx, DCS removed Mother's older son from her care. Though Mother is permitted to visit her first child, he is in the custody of her mother—the child's maternal grandmother. Mother expressed her fear that she would lose her second child as well if DCS knew that she had relapsed. Mother claimed that she participated in drug treatment in April 2016, but she failed to provide documentation of such treatment. She also failed to inform DCS of the claimed treatment.

Regarding her employment, Mother testified that she worked at a Pilot convenience store from January 2016 to April 2016. According to Mother, she was unemployed at the time of the hearing but actively looking for work. The record does not contain testimony or other evidence regarding her wages or expenses.

Finally, Lynx's foster mother testified concerning the child's well-being. DCS placed Lynx in her home immediately following his removal from Mother's home on November 10, 2015. The foster mother testified that despite initial setbacks, Lynx is "right where he should be" regarding development. Lynx refers to his foster parents as "mom" and "daddy," and they have expressed their desire to adopt him.

3

By order entered on August 2, 2016, the court terminated Mother's parental rights on the grounds of abandonment by willful failure to visit and willful failure to support.[3] The court also found, after reviewing the relevant statutory factors, that it was in the child's best interest to terminate Mother's parental rights. On appeal, Mother argues that the juvenile court erred in finding clear and convincing evidence of the grounds for termination and in finding clear and convincing evidence that termination was in the child's best interest.

## II. ANALYSIS

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). However, parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (Supp. 2015).

Tennessee Code Annotated § 36-1-113 sets forth the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). Second, they must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, the parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.3d at 596. "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It

---

[3] The trial court's order does not address DCS's claim that Mother abandoned her child by failure to establish a suitable home. However, the court made clear in its oral findings, which were memorialized in the transcript of the July 26, 2016 hearing and included in the record on appeal, that it found the evidence insufficient to terminate Mother's rights on that ground. DCS does not appeal the court's decision.

produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). Additionally, as this Court has recently explained, "[w]hen the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Nevada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). Thus, this Court gives great weight to the credibility accorded to a particular witness by the trial court. *Id.* (citing *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)).

In termination proceedings, "the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007). We "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016), *cert. denied sub. nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44, 196 L. Ed. 2d 28 (2016).

A. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

Mother appeals the termination of her parental rights on the grounds of abandonment both by willful failure to visit and by willful failure to support under Tennessee Code Annotated § 36-1-113(g)(1) and § 36-1-102(1)(A)(i). Tennessee Code Annotated § 36-1-113(g)(1) enumerates abandonment as the first ground for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1). There are five alternative definitions of abandonment listed in Tennessee Code Annotated § 36-1-102(1)(A). Abandonment, under Tennessee Code Annotated § 36-1-102(1)(A)(i), "is defined as the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2015). Here, because the petition was filed on March 21, 2016, the relevant four-month period is November 20, 2015, to March 20, 2016, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-

5

COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

In order to terminate parental rights on the ground of abandonment, the court must find the abandonment to be willful. "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

1. Abandonment by Failure to Visit

We begin with the ground of abandonment by willful failure to visit. The juvenile court found Mother had abandoned Lynx by her failure to visit him for four consecutive months preceding the filing of the petition to terminate her parental rights. On appeal, Mother does not dispute that she did not visit the child. Rather, she asserts that her failure to visit was not willful because she had relapsed during the relevant time period.

This Court has previously stated, "[a] parent who attempts to visit and maintains a relationship with the child, but is 'thwarted by the acts of others and circumstances beyond [her] control,' cannot be found to have willfully abandoned the child." *In re Jaylah W.*, 486 S.W.3d 537, 551 (Tenn. Ct. App. 2015) (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Mother appears to argue that her drug addiction and untimely relapse are circumstances beyond her control. To say it another way, Mother seeks a holding that her alleged relapse prevents a finding that her abandonment was willful. However, we do not find Mother's argument persuasive based on the facts before us.

First, Mother's relapse is not in line with the types of circumstances that our courts have found to preclude a finding of willfulness. For instance, a third party's conduct that "amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child" may excuse a parent's failure to visit. *In re Audrey S.*, 182 S.W.3d at 864 (holding incarcerated mother's failure to visit her children was not willful when the children's fathers would not bring them to visit her in prison). But Mother was not prevented from seeing her children by the actions of another. Nor does she claim that financial difficulties, problems with transportation, or other related issues prevented her from visiting her children. *See In re Lyric J.*, No. M2014-00806-COA-R3-PT, 2014 WL 7182075, at *6 (Tenn. Ct. App. Dec. 16, 2014) ("Father's limited finances, the distance he had to travel, and his responsibilities as the father of four other children living in California made it extremely difficult for Father to visit Child."). Additionally, while this Court has declined to amerce a parent for voluntarily entering drug treatment

during the relevant four month period, *see In re A.D.A.*, 84 S.W.3d 592, 598 (Tenn. Ct. App. 2002), Mother does not claim that she was attempting to address her drug addiction during that time.

Moreover, we are not convinced that Mother's condition prevented her from keeping in contact with DCS or attempting to visit her child. While Mother contends that this is the case, she also testified that she was employed by Pilot during at least part of the four-month period immediately preceding the petition. She, therefore, does not contend that her drug use left her incapacitated or physically unable to keep up with her responsibilities. In fact, Mother admitted that she avoided contact with DCS because she feared that the caseworker would learn of her continued drug use. She also proved that she was able to contact DCS, despite her alleged relapse, by calling her caseworker twice during the four months at issue. However, her minimal efforts are insufficient to overcome the clear and convincing evidence that her failure to visit her child was willful. Though Mother claims, without proof, that she attended drug treatment in April 2016, her last-minute effort falls outside of the four-month window. *See In re Jaylah W.*, 486 S.W.3d at 553 (finding a mother's efforts to get an appointment for mental health counseling after the relevant four-month period to be "too little, too late").

We, therefore, conclude that DCS has carried its burden to show that Mother's failure to visit was willful. Although one statutory ground is sufficient to terminate parental rights, we must consider each ground relied upon by the juvenile court. *See In re Carrington H.*, 483 S.W.3d at 525-26.

2. Abandonment by Failure to Support

The juvenile court also found Mother had abandoned Lynx by her failure to provide any child support while he has been in foster care. Again, Mother argues that the court erred in finding her abandonment on this ground to be willful.

Under this ground for termination, the financial ability, or capacity, of a parent to pay child support must be considered in determining willfulness. A parent's failure to support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014). In making a willfulness determination, the court must review a parent's means, which includes both her income and available resources for purposes of support. *See In re Adoption of Angela E.*, 402 S.W.3d at 641.

Regarding Mother's ability to pay, DCS relies on Mother's testimony that she worked at Pilot from January 2016 to April 2016 and evidence that she was able to maintain the same residence through at least May 2016. We, however, conclude that the evidence was less than clear and convincing that Mother willfully failed to support her child. The record lacks any evidence related to Mother's wages, expenses, or other

7

financial responsibilities. A review of the transcript of the hearing on the petition reveals that Mother was not even questioned about these matters. Without at least some testimony concerning Mother's income during the four months preceding the filing of the petition, we simply cannot agree that her failure to pay child support was willful. *See In re B.L.*, No. M2003-01877-COA-R3-PT, 2004 WL 2451355, at *10 (Tenn. Ct. App. Nov. 1, 2004) (holding DCS did not meet its burden of establishing willfulness when the record contained insufficient evidence of mother's basic living expenses and the consistency of her work). Thus, DCS did not carry its burden of establishing failure to support as a ground for termination.

## B. BEST INTEREST OF THE CHILD

We have found that DCS has proven one ground for termination of Mother's parental rights, abandonment by failure to visit, so we now turn to the issue of whether termination is in the best interests of the child. Because "[n]ot all parental misconduct is irredeemable, . . . Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i)[4] lists nine factors that courts may consider in making a

---

[4] The statutory factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian

8

best interest analysis. The focus of this analysis is on what is best for the child, not what is best for the parent. *Id.* at 499. At the same time, "the inquiry should address itself to the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

Like the juvenile court, we conclude DCS has proven by clear and convincing evidence that termination of Mother's parental rights is in Lynx's best interest. Even accepting as true that Mother has participated in a drug treatment program, there is no evidence suggesting she has established lasting sobriety. She has not maintained regular visitation or other contact with her child, leading us to agree with the juvenile court's finding that "there cannot possibly still be a meaningful relationship" between them based on Lynx's young age when he was removed from Mother's home. Despite her son's health issues relating to his drug exposure at birth, Mother consistently failed to keep appointments with his pediatrician. Thus, the evidence does not preponderate against the court's finding that Mother "has shown neglect toward the child." Moreover, Lynx has benefited from the environment in the foster home and from his foster mother's willingness to meet his medical needs. He has a strong relationship with his foster parents, and they desire to adopt him. We agree with the juvenile court that changing caregivers would be detrimental to him.

## III. CONCLUSION

We conclude DCS failed to meet its burden of proving that Mother willfully abandoned her child by failure to support. Nonetheless, the record contains clear and convincing evidence to support terminating Mother's parental rights on the ground of abandonment by failure to visit and to support the juvenile court's conclusion that terminating Mother's parental rights is in the child's best interest. Therefore, we affirm the juvenile court's decision to terminate parental rights.

_____
W. NEAL MCBRAYER, JUDGE

---

from effectively providing safe and stable care and supervision for the child; or

    (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).